**KRIVO INDUSTRIAL SUPPLY COMPANY and Morgan Precision Parts, Inc., et al., Plaintiffs-Appellants,**

v.

**NATIONAL DISTILLERS AND CHEMICAL CORPORATION, Defendant-Appellee.**

**No. 72-1710.**

United States Court of Appeals,
Fifth Circuit.

Aug. 7, 1973.

Samuel G. McKerall, James L. Shores, Birmingham, Ala., Lewis & Burns, Robert E. Lewis, Hawkins, Rhea, Keener & Cusimano, Gadsden, Ala., for plaintiffs-appellants.

Reid B. Barnes, Robert McDavid Smith, Birmingham, Ala., for defendant-appellee.

Before GEWIN, GODBOLD and RONEY, Circuit Judges.

RONEY, Circuit Judge:

■ Plaintiffs, ten creditors of a now reorganized corporation, individually sued National Distillers and Chemical Corp., the major creditor of that corporation, on their debts. Finding that the cases all involved common questions of law and fact, the District Court consolidated them for trial on the single issue of liability. The issue of damages was severed and was reserved for subsequent proceedings. The alleged liability of National Distillers was predicated upon the rule that, when one corporation controls and dominates another corporation to the extent that the second corporation becomes the "mere instrumentality" of the first, the dominant corporation becomes liable for those debts of the subservient corporation attributable to an abuse of that control. After hearing plaintiffs' evidence, the District Court granted a directed verdict in favor of National Distillers. We affirm, finding that the evidence was insufficient to establish a jury question as to the presence of the requisite degree of control.

### I. The Law

■ In this diversity suit, federal law provides the procedural standard against which we must judge the propriety of the directed verdict, and Alabama law provides the substantive legal context within which we must scrutinize the evidence.

### *Directed Verdicts*

■ The standard for reviewing a directed verdict is set out in Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1969):

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case —but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impar-

tial judgment might reach differing conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

411 F.2d at 374–375.

 On appeal, then, the party against whom a verdict was directed must demonstrate the existence of a conflict in substantial evidence. He must show that, at trial, he introduced sufficient evidence so that reasonable men, weighing all the evidence, might reach different conclusions. Backer v. Coursey, 472 F.2d 887 (5th Cir. 1973); Jones v. Concrete Ready-Mix, Inc., 464 F.2d 1323 (5th Cir. 1972); Trawick v. Manhattan Life Ins. Co., 447 F.2d 1293 (5th Cir. 1971).

#### The "Instrumentality" Doctrine

We note at the outset that the case before us involves only the question of National Distillers' liability under the "instrumentality" theory. It involves no question of fraud, deceit, or misrepresentation. Nor does it involve charges that National Distillers received large amounts of security for small debt and made excessive, overreaching profits through foreclosure. Hence, we must examine the evidence exclusively within the framework of the narrow rule of corporation law known as the "instrumentality" doctrine.

 Basic to the theory of corporation law is the concept that a corporation is a separate entity, a legal being having an existence separate and distinct from that of its owners. This attribute of the separate corporate personality enables the corporation's stockholders to limit their personal liability to the extent of their investment. But the corporate device cannot in all cases insulate the owners from personal liability. Hence, courts do not hesitate to ignore the corporate form in those cases where the corporate device has been misused by its owners. The corporate form, however, is not lightly disregarded, since limited liability is one of the principal purposes for which the law has created the corporation.

 One of the most difficult applications of the rule permitting the corporate form to be disregarded arises when one corporation is sought to be held liable for the debts of another corporation. A corporation may become liable for the debts of another corporation in two ways. First, expressly or impliedly, it may assume responsibility for those debts by indicating to the creditors of the other corporation that it stands behind those debts as a guarantor. In this situation, one separate and distinct corporation becomes responsible for the debts of another separate and distinct corporate entity. The corporate form of each remains intact and liability is not predicated upon disregarding the corporate form of the debtor. Second, a corporation may be held liable for the debts of another corporation when it misuses that corporation by treating it, and by using it, as a mere business conduit for the purposes of the dominant corporation. See generally 1 W. Fletcher, Cyclopedia of the Law of Private Corporations § 43 (perm. ed. rev. 1963). The rationale for holding the dominant corporation liable for the subservient corporation's debts is that, since the dominant corporation has misused the subservient corporation's corporate form by using it for the dominant corporation's own purposes, the debts of the subservient corporation are in reality the obligations of the dominant corporation. In these cases, "the courts will look

through the forms to the realities of the relation between the companies as if the corporate agency did not exist and will deal with them as the justice of the case may require." United States v. Reading Co., 253 U.S. 26, 63, 40 S.Ct. 425, 434, 64 L.Ed. 760 (1920); cf. Chicago, Milwaukee & St. Paul Ry. Co. v. Minneapolis Civic & Commerce Ass'n, 247 U.S. 490, 38 S.Ct. 553, 62 L.Ed. 1229 (1918). Here, then, the corporate form of the subservient corporation is disregarded so as to affix liability where it justly belongs. Plaintiffs' claim in this case is based on this second theory of liability.

In formulating a basis for predicating liability of a dominant corporation for the acts or omissions of another corporation, courts have developed various legal theories and descriptive terms to explain and to describe the relationship between a dominant and a subservient corporation. For example, under the "identity" theory the separate corporate identities are disregarded and both corporations are treated as one corporation. See United States v. Lehigh Valley R.R. Co., 220 U.S. 257, 31 S.Ct. 387, 55 L.Ed. 458 (1911). Alternatively, a subservient corporation may be labeled the instrument, agent, adjunct, branch, dummy, department, or tool of the dominant corporation. See, e. g., Constitution Publishing Co. v. Dale, 164 F.2d 210 (5th Cir. 1947); Birmingham Realty Co. v. Crossett, 210 Ala. 650, 98 So. 895 (Ala.1923). "Instrumentality" is perhaps the term most frequently employed to describe the relationship between a dominant corporation and its subservient corporation, and Alabama law follows this characterization. In Forest Hill Corp. v. Latter & Blum, Inc., 249 Ala. 23, 29 So.2d 298 (Ala.1947), the Alabama Supreme Court stated:

> The notion of separate corporate existence will not be recognized where a corporation is so organized and controlled and its business conducted in such a manner as to make it merely an instrumentality of another, and in such circumstances the fiction may not be

prosecuted to permit the corporation to evade its just responsibilities.

29 So.2d at 302. See also Brown v. Standard Casket Mfg. Co., 234 Ala. 512, 175 So. 358 (1937); Birmingham Realty Co. v. Crossett, supra.

Nevertheless, the mere incantation of the term "instrumentality" will not substitute for rigorous, tough-minded analysis. Professor Ballantine once described this aspect of the law of corporations as a "legal quagmire," Ballantine, Separate Entity of Parent and Subsidiary Corporations, 14 Cal.L.Rev. 12, 15 (1925), and Justice Cardozo observed that these cases tend to be "enveloped in the mists of metaphor." Berkey v. Third Avenue Ry. Co., 244 N.Y. 84, 155 N.E. 58, 61 (1926). Moreover, the very term "instrumentality" is a poor one because all corporations are in one sense "instrumentalities" of their stockholders. See May Dept. Stores Co. v. Union Electric Light & Power Co., 341 Mo. 299, 107 S. W.2d 41 (1937).

To counteract the dangers of a legal analysis based upon ambiguous metaphors and to avoid the trap of mere definitionalism, the case law has developed a more concrete test to guide the application of the "instrumentality" doctrine. Although the Alabama courts have yet to delineate a more precise test, the parties in the case at bar agree, and we agree, that two elements are essential for liability under the "instrumentality" doctrine. First, the dominant corporation must have controlled the subservient corporation, and second, the dominant corporation must have proximately caused plaintiff harm through misuse of this control. See Berger v. Columbia Broadcasting System, Inc., 453 F.2d 991 (5th Cir.), cert. denied, 409 U. S. 848, 93 S.Ct. 54, 34 L.Ed.2d 89 (1972) (applying New York law); see also National Bond Finance Co. v. General Motors Corp., 238 F.Supp. 248 (W.D.Mo. 1964), aff'd, 341 F.2d 1022 (8th Cir. 1965); Huski-Bilt, Inc. v. First-Citizens Bank & Trust Co., 271 N.C. 662, 157 S. E.2d 352 (1967).

In considering the first element, that of control, the courts have struggled to delineate the kind of control necessary to establish liability under the "instrumentality" rule. Two problem areas have persistently troubled the process of ascertaining the extent of control. First, to what extent is stock ownership critical, and second, how much weight should be given to the existence of a creditor-debtor relationship in those cases where the debtor corporation is alleged to be the "instrumentality" of its creditor?

■ As to the effect of stock ownership, an examination of the case law in this area indicates that the fact that the allegedly dominant corporation held an ownership interest in another, allegedly subservient, corporation does not, *per se*, resolve the question of control. For example, in Owl Fumigating Corp. v. California Cyanide Co., 24 F.2d 718 (D.Del. 1928), aff'd, 30 F.2d 812 (3d Cir. 1929), the allegedly dominant corporation owned all of the stock of another corporation. The District Court, in rejecting an attempt to establish liability on the part of the defendant by disregarding the corporate form of the allegedly subservient corporation, found that defendant had done nothing beyond the authority legally vested in it as a creditor and a stockholder.

On the other hand, the fact that the allegedly dominant corporation held *no* stock ownership interest in the allegedly subservient corporation has not precluded application of the "instrumentality" rule where actual and total control has been otherwise established.

For example, in Baltimore & Ohio Tel. Co. v. Interstate Tel. Co., 54 F. 50 (4th Cir. 1893), the defendant did in fact own all of the stock of the debtor corporation, but the Fourth Circuit recognized that broader principles, especially the actual exercise of direction, management, and control over the debtor corporation, governed its decision. Liability flowed from control, whether that control arose out of the defendant creditor's actions as "sole beneficial owner of all

[of the debtor corporation's] stock, or as creditor who had made large advances . . . ." 54 F. at 54.

In Henderson v. Rounds & Porter Lumber Co., 99 F.Supp. 376 (W.D.Ark. 1951), the defendant contended that liability was precluded since it did not own a majority of the capital stock of the subservient corporation. Rejecting that view, the District Court stated: "the real basis of liability is actual control and manipulation of [the subservient corporation], whether that control and manipulation be exercised by virtue of stock ownership or otherwise." 99 F. Supp. at 383–384.

In Portsmouth Cotton Oil Refining Corp. v. Fourth National Bank, 280 F. 879 (M.D.Ala.), aff'd, 284 F. 718 (5th Cir. 1922), the defendant bank owned no stock in the debtor corporation, but the two entities had interlocking directorates and common shareholders. Affirming a verdict that disregarded the corporate form of the debtor corporation in order to affix liability to the defendant bank, this Court refused to be bound by the paper technicalities of the relationship, and stated:

> The important question is whether the defendant bank managed, operated, and controlled the [debtor], and the fact that the latter had a valid corporate existence was wholly immaterial.

284 F. at 719.

■ As with stock ownership, a creditor-debtor relationship also does not *per se* constitute control under the "instrumentality" theory. The general rule is that the mere loan of money by one corporation to another does not automatically make the lender liable for the acts and omissions of the borrower. *See* Peterson v. Chicago, Rock Island & Pacific Ry. Co., 205 U.S. 364, 27 S.Ct. 513, 51 L.Ed. 841 (1907); Henderson v. Rounds & Porter Lumber Co., *supra*. The logic of this rule is apparent, for otherwise no lender would be willing to extend credit. The risks and liabilities would simply be too great. Neverthe-

less, lenders are not automatically exempt from liability under the "instrumentality" rule. If a lender becomes so involved with its debtor that it is in fact actively managing the debtor's affairs, then the quantum of control necessary to support liability under the "instrumentality" theory may be achieved.

An examination of "instrumentality" cases involving creditor-debtor relationships demonstrates that courts require a strong showing that the creditor assumed actual, participatory, total control of the debtor. Merely taking an active part in the management of the debtor corporation does not automatically constitute control, as used in the "instrumentality" doctrine, by the creditor corporation.

The broad scope permitted creditors to institute various restrictions on the activities of their debtors is exemplified by Chicago Mill & Lumber Co. v. Boatmen's Bank, 234 F. 41 (8th Cir. 1916). In *Chicago Mill & Lumber Co.*, a bank lent large sums of money to a mill and land company. To protect its investment, the bank had its assistant cashier elected president of the debtor company. The manager of the company testified that he took his directions from either the president of the bank or the assistant cashier who headed the company. After the company went into bankruptcy, a creditor sued the bank on the theory that the bankrupt company had been merely a department of the bank and that the bank's arrangements for monitoring the activities of its debtor entitled the plaintiff to a jury determination of whether or not the company was in fact controlled by the bank.

Affirming the District Court's directed verdict in favor of the bank on the issue, the Eighth Circuit accorded great importance to the fact that "the bank was a large creditor, and as such largely interested in the prosperity of the company, and most naturally should desire to keep an oversight over its doings." 234 F. at 46. Referring to various statements attributed to bank personnel indicating that the bank owned the company or was conducting the company's business in the bank's behalf, the Court stated:

> Comprehensively speaking, they are all easily and naturally referable to a legitimate and customary practice of keeping an oversight by a creditor over the business, management, and operations of a debtor of doubtful solvency. All the facts of this case and all the reasonable inferences deducible from them would not, in our opinion, have warranted a jury in finding . . . that the [bank] was carrying on the business of the [company] as a part of its own . . . .

*Id. See also* American Southern Trust Co. v. McKee, 173 Ark. 147, 293 S.W. 50 (1927) (contract by which creditor banks made further advances to debtor bank, sent their agent to protect their interests by looking after collateral, loans, and collections, and required debtor to keep cash deposits with them, cannot be construed as authority to take over debtor bank, or to control or manage it).

Not all "instrumentality" cases that involve creditor-debtor pressures result in findings of no liability. But in the cases resulting in "instrumentality" liability for the creditor, the facts have unmistakably shown that the subservient corporation was being used to further the purposes of the dominant corporation and that the subservient corporation in reality had no separate, independent existence of its own.

This absence of an independent corporate purpose is most apparent in those cases in which the dominant corporation, to further its own corporate purposes, either organized or acquired the subservient corporation.

For example, in Centmont Corp. v. Marsch, 68 F.2d 460 (1st Cir. 1933), cert. denied, 291 U.S. 680, 54 S.Ct. 530, 78 L.Ed. 1068 (1934), a railway company organized another corporation to build an addition to the railway company's line. Affirming the District Court's conclusion that the corporation

was a mere instrumentality of the railway company, the First Circuit found the evidence overwhelming that the subservient corporation had been established and had been operated solely for the purposes of the dominant railway company.

In American National Bank v. National Wall-Paper Co., 77 F. 85 (8th Cir. 1896), the Eighth Circuit affirmed the jury verdict in favor of a plaintiff who had sued a bank on the debt of a corporation organized by the bank. Again, liability under the "instrumentality" rule was predicated largely upon the absence of a separate corporate purpose of the subservient corporation:

> One reading the testimony in the case cannot wink so hard as not to see that the [subservient corporation] was a creation of the bank for its own purposes, that the business conducted in the name of this new creation was the bank's business, and that the bank was the recipient of the proceeds of the business, and was fully advised of all that was going on, including the purchase of the goods from the plaintiff.

77 F. at 91.

In Henderson v. Rounds & Porter Lumber Co., *supra*, the dominant corporation was held liable for the debts of its bankrupt subservient corporation because the evidence was clear that the bankrupt corporation had been formed to further the corporate purposes of the dominant corporation and had been controlled and manipulated to the extent that it had no separate corporate existence of its own. *See also* In re Otsego Waxed Paper Co., 14 F.Supp. 15 (W.D. Mich.1935) (dominant corporation operated subservient corporation as a division); Portsmouth Cotton Oil Refining Corp. v. Fourth National Bank, *supra* (bank organized subservient corporation for the sole purpose of handling property owned by the bank).

▆ In summary, then the control required for liability under the "instrumentality" rule amounts to total domination of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation. As Professor Fletcher states:

> The control necessary to invoke what is sometimes called the "instrumentality rule" is not mere majority or complete stock control but such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal.

1 W. Fletcher, *supra*, § 43 at 204–205. No lesser standard is applied in "instrumentality" cases involving a creditor-debtor relationship. As the Court said in In re Kentucky Wagon Mfg. Co., 3 F. Supp. 958, 963 (W.D.Ky.1932), aff'd, 71 F.2d 802 (6th Cir.), cert. denied, Laurent v. Stites, 293 U.S. 612, 55 S.Ct. 142, 79 L.Ed. 701 (1934), "[i]t is to be noted that it is not 'controlling influence' that is essential. It is actual control of the action of the subordinate corporation."

▆ In addition to actual and total control of the subservient corporation, the "instrumentality" rule also requires that fraud or injustice proximately result from a misuse of this control by the dominant corporation. Berger v. Columbia Broadcasting System, Inc., *supra*; *see* National Bond Finance Co. v. General Motors Corp., *supra*. Alabama emphatically rejects actual fraud as a necessary predicate for disregarding the corporate form, holding instead that courts may decline to recognize corporate existence whenever recognition of the corporate form would extend the principle of incorporation "beyond its legitimate purposes and [would] produce injustices or inequitable consequences." Forest Hill Corp. v. Latter & Blum, Inc., *supra*, at 302.

This is the better rule, for the theory of liability under the "instrumentality" doctrine does not rest upon intent to defraud. It is an equitable doctrine that places the burden of the loss upon the

party who should be responsible. The basic theory of the "instrumentality" doctrine is that the debts of the subservient corporation are in reality the obligations of the dominant corporation.

## II. The Factual Background

Because the facts are critical in cases under the "instrumentality" rule, we detail the events and transactions tending to illuminate the relationship between the defendant National Distillers and Brad's Machine Products, Inc., for whose debts the plaintiff creditors seek to hold National Distillers responsible.

Brad's Machine Products, Inc., was a California corporation that began its existence as a machine shop in Stanton, California. Employing approximately 25 persons, Brad's was owned by John C. Bradford and his wife Nola. In addition to the machine business, Bradford's investments included a championship quarter horse, racing boats, airplanes, an Arizona bar, an Alabama motel, Florida orange groves, and oil wells. In addition, Bradford, a country and western singer, formed a motion picture company, Brad's Productions, Inc., through which he produced a film that featured him as a singer. All of these investment activities were funded by his income from the machine shop.

The record shows that Bradford was an able and inventive machinist and that the California operation had been profitable. In 1966, Bradford saw potential profit in the munitions industry, so he employed Arnold Seitman to guide his entry into the Government contracting system. Seitman had previously supervised government contracting for a company in Gadsden, Alabama, and he soon obtained for Brad's a 2.7 million dollar contract for the production of M–125 fuses, the principal component of which was brass.

Bradford's skills as a machinist enabled him to develop a very efficient and unique system for manufacturing the fuse bodies. Instead of making them from a cored forging, Bradford machined them directly from brass rods two inches in diameter and eighteen feet long. This new technique was said to have revolutionized the manufacture of that particular fuse body.

In the latter months of 1966, Brad's moved its entire operation from California to Gadsden, attracted by the availability of unskilled labor, lower wages, and cheaper plant acquisition costs. Brad's operated in Gadsden, regularly employing about five hundred persons, until financial problems forced it to close in 1970.

For a brief time, Brad's appeared to prosper. Bradford's wide-ranging investments, however, soon became a severe financial drain on the Brad's operation. One subsidiary, a Gadsden box plant that made wooden boxes for shells, alone lost over one million dollars. By the end of 1968, Brad's was headed for financial distress.

The M–125 booster fuse assembly was the major product manufactured by Brad's, accounted for ninety percent of its gross sales, and required substantial quantities of brass rods. In the beginning Brad's had purchased its brass requirements from three sources: Revere Brass Company, Mueller Brass Company, and Bridgeport Brass Company. Brad's principal source of supply was Bridgeport, and Brad's was one of Bridgeport's larger customers. Bridgeport is a division of the defendant, National Distillers and Chemical Corporation.

In early 1969, Bridgeport was shipping approximately $400,000–$500,000 worth of brass rod to Brad's every month. In March, 1969, Brad's owed Bridgeport approximately $1,000,000 and Bridgeport, at the request of Brad's, agreed to convert this arrearage to a promissory note. On March 28, 1969, Bridgeport accepted Brad's note, secured by (1) the personal guaranties of John C. Bradford, Chairman of the Board and sole stockholder of Brad's, and his wife and (2) a mortgage on real property owned by J–N Industries, Inc., a subsidiary of Brad's located in Tucson, Arizona. The note was payable at the rate of

$40,000 per month, plus interest on the unpaid balance, and it contained a "balloon agreement" under which the final payment in March of 1970 would equal the unpaid balance. Another provision stated that the note was to be extended to March 1, 1971, if, prior to April 1, 1970, Brad's entered into another contract with the Government for the manufacture and sale of fuse bodies, with the same cash flow and the same economic benefits to Brad's as under the then-current contract.

In connection with the agreement for deferred payment, Brad's and Bridgeport entered into a "financing and loan agreement." Under this agreement, Bridgeport agreed to continue to supply Brad's with brass rod, so long as Brad's paid for current brass shipments within fifteen or sixteen days (with a ten day grace period). Despite this condition, by the end of July, 1969, Bridgeport permitted Brad's to build up an additional $630,000 in brass rod accounts payable.

On August 1, 1969, Bradford, Brad's President E. J. Huntsman, and Brad's Comptroller Roy Compton, went to New York to confer with representatives of National Distillers, including Assistant General Counsel and Secretary John F. Salisbury. The representatives of Brad's stated that its current financial situation precluded continued operation unless it received additional assistance, including working capital. They blamed the unsuccessful attempts to diversify Brad's as the reason for the company's financial straits. Moreover, they needed immediate assistance because the Government had threatened to cancel the current fuse contract if the financial condition of Brad's continued to worsen. Bradford offered to put up all the assets he and the company had in exchange for the additional funds and for National Distillers' intervention with the Government on behalf of Brad's.

At the close of the August 1, 1969, meeting, National Distillers and Brad's reached an oral agreement in line with Bradford's requests. National Distillers was to (1) provide internal financial management assistance to help Brad's eliminate costly waste, (2) lend Brad's another $600,000 in cash, (3) defer payment on the $630,000 accounts receivable, (4) help Brad's and Bradford liquidate unprofitable holdings to provide more capital for Brad's, and (5) intervene with the Government to prevent cancellation of the current fuse body contract. Brad's and Bradford personally were to assign to National Distillers as collateral the various interests accumulated during the attempted diversification.

Salisbury immediately telephoned a Government official in Birmingham, Alabama, whose job included monitoring for the Defense Contract Administration Service the financial ability of Brad's to perform its Government contracts, and assured him of National Distillers' intent to aid Brad's. On August 4, 1969, Brad's executed notes for the $600,000 in cash and for the $630,000 in unpaid accounts receivable, with National Distillers taking a real estate mortgage on the Gadsden plant and premises and a security agreement covering the plant's furniture and fixtures. Brad's and Bradford also assigned to National Distillers certain shares of capital stock of other corporations, several oil and gas leases, and all of the capital stock of Brad's Productions, Inc. These assets were to be sold and the proceeds were to be returned to the operating capital of Brad's. To help the financial management at Brad's, Leon Rudd, one of National Distillers' "Internal Auditors" was sent to Gadsden to oversee its finances and to establish control procedures for managing cash and investments. Finally, Salisbury assigned one of his assistants to help him and Brad's dispose of the assets assigned to National Distillers and other assets not so assigned. Under the terms of several agreements, both formal and informal, National Distillers agreed that any income or proceeds from these unassigned assets would be used for certain designated purposes in aid of Brad's other

creditors and then either would revert to Brad's or to Bradford or would belong to National Distillers outright.

Rudd remained with Brad's for fifteen months, during which National Distillers loaned Brad's an additional $169,000 in cash and deferred another $667,131.28 in accounts payable by Brad's to Bridgeport. Despite these transfusions, Brad's ceased its operations in December, 1970. These suits resulted from debts left unpaid by Brad's.

### III. The Decision

After a comprehensive review of the testimony and exhibits presented by the plaintiffs in the District Court, and viewing the evidence in the light most favorable to the plaintiffs, we conclude that the evidence was not "of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions," Boeing v. Shipman, *supra*, 411 F.2d at 374, on the issue of control. Keeping in mind that the kind of control prerequisite to liability under the "instrumentality" rule is actual, operative, total control of the subservient corporation, the evidence here was wholly insufficient to support a jury decision that Brad's had "no separate mind, will or existence of its own and [was] but a business conduit" for National Distillers. The evidence is overwhelming that Brad's maintained a separate, independent corporate existence at all times. Hence, the motion for a directed verdict in favor of defendants was properly granted.

■ In cases involving the "instrumentality" rule, we must take a broad approach to the question of control, examining all of the plaintiffs' evidence to ascertain if the allegedly subservient corporation in fact had no separate corporate purposes or existence. In the case before us, plaintiffs presented evidence of (1) National Distillers' ownership of majority control of Brad's, (2) National Distillers' view of its relationship to Brad's, (3) the scope of National

Distillers' control over Brad's, and (4) the alleged exploitation of Brad's supposedly wrought through abuses of that control.

■ 1. Although stock ownership is not *per se* determinative of the issue of control, see Baltimore & Ohio Tel. Co. v. Interstate Tel. Co., *supra*; Henderson v. Rounds & Porter Lumber Co., *supra*; Portsmouth Cotton Oil Refining Corp. v. Fourth National Bank, *supra*, it is a factor to be considered in assessing the relationship between two companies sought to be linked under the "instrumentality" rule.

Plaintiffs attempted to prove that the stock ownership of Brad's had been transferred from John C. Bradford to National Distillers. Plaintiffs introduced (1) letters indicating that National Distillers intended to enter into an agreement with Bradford to assign the stock to National Distillers, (2) a memorandum dated August 13, 1969, and written by National Distillers' credit manager, Zimmerman, indicating that the stock transfer was "in process," and (3) a guaranty executed by National Distillers promising to repay a loan made to Brad's, that referred to National Distillers as "a mortgage holder" of the Brad's stock. Significantly, no one testified that the Brad's stock was ever actually assigned. On the other hand, National Distillers' Salisbury testified that, despite his earlier intent to take the stock, the transfer was never consummated because he feared endangering National Distillers' mortgage interest. Salisbury also testified that the reference to National Distillers as "a mortgage holder" of the Brad's stock was made at a time when National Distillers still intended to effect the transfer. Moreover, Seitman, who returned to Brad's in September of 1969, who became its president and a director in February, 1970, and who certainly would have known whether the stock was transferred, testified unequivocally that no transfer ever was effected. Hence, plaintiffs failed to create an issue of fact on this point.

2. According to plaintiffs, the evidence shows that National Distillers believed that it had the power to control Bradford and his corporation and acted accordingly. A careful examination of this evidence, however, makes clear that National Distillers considered control of Brad's to be, at most, only partly shared between National Distillers and Brad's.

First, a letter from National Distillers' Salisbury to the general manager of the movie company, Brad's Productions, Inc., stated: "As I am sure you are aware, National Distillers and Chemical Corporation has taken an active role in the management and control of Brad's Machine Products, Inc., and various other undertakings of John C. Bradford." This letter, however, is not inconsistent with National Distillers' argument, which we conclude is correct, that the evidence shows that Brad's voluntarily *shared* control with National Distillers. The letter does not say that National Distillers had taken control of Brad's; rather, it states only that National Distillers had "taken an active role in the management and control of Brad's."

Second, according to Compton's testimony, National Distillers' credit manager, Zimmerman, told him that National Distillers "had the power, authority to fire Bradford and run him off." But the evidential importance of this statement is clarified by Compton's preceding testimony: "he (Zimmerman) said that Mr. Bradford should be fired and control taken away from him, and the plant be run properly." This language indicates that, although an employee of National Distillers may have felt that they should have taken control of Brad's away from John Bradford, they had not done so. Moreover, Compton testified that he did not believe that National Distillers would fire Bradford.

Third, plaintiffs quote Seitman's testimony that states that Salisbury at one time threatened to "fire" both Seitman and Bradford and run the Brad's operation itself. A complete reading of Seitman's testimony indicates that he believed that National Distillers' so-called power or authority to "fire" lay in its "control of the purse strings." Seitman testified that National Distillers could not "have told Brad's who its officers were to be," and he then stated that he understood Salisbury to mean that National Distillers would cease extending credit to Brad's if certain contracts were not fulfilled. Thus, it is plain that National Distillers could have "fired" Brad's personnel only by cutting off credit or loans, thereby putting Brad's out of business. The record contains no evidence showing that National Distillers conceived that it could have directed or implemented the replacement and selection of management personnel, absent credit control.

3. As to the scope of National Distillers' alleged control, the evidence shows only that National Distillers' activities were narrowly restricted to safeguarding its interests as a major creditor of Brad's, that National Distillers participated in the corporate decision-making at Brad's only to a limited degree, and that at no time did National Distillers assume actual, participatory, total control of Brad's.

The thrust of plaintiffs' contention here is that Leon Rudd, who was sent to the Gadsden plant by National Distillers in August, 1969, and who remained until late November, 1970, actively dominated the Brad's decision-making apparatus during his stay.

A reading of the testimony, especially that of the Brad's comptroller Compton, compels a conclusion that Rudd's activities were much more circumscribed than appellants argue. Rudd, an internal auditor employed by National Distillers, was transferred to Brad's in response to John Bradford's request for assistance in establishing a system of internal controls. Rudd was not thrust upon Brad's unwanted or unneeded.

Because many of the financial problems at Brad's had been precipitated by improvident investments and uncontrolled spending, Rudd immediately moved to put himself in the position of monitoring Brad's cash outlays. Ac-

cording to Compton's testimony, Rudd suggested, and they all "readily agreed," that no purchase orders be sent out without his prior approval. Also, Rudd's signature was made mandatory on all checks from the Brad's accounts. From these "controls," plaintiffs would extrapolate the theory that National Distillers, through Rudd, was in charge of Brad's. Such a conclusion is untenable.

First, the evidence showed that, in fact, Rudd's prior approval of purchase requisitions was not always necessary for purchases. At the trial, several of plaintiffs' purchase orders, put in evidence for other purposes, were shown to have been made up and sent out without Rudd's approval.

Second, assuming that Rudd in fact enjoyed such an all-powerful veto over purchases, this power was never exercised where Brad's proper business purposes were involved. Rather, Rudd voiced his displeasure only when expenditures were contemplated that were unrelated to the Brad's machine shop operation.

Third, Rudd's powers were essentially negative in character. The testimony showed that his function was to monitor the finances and to help Compton fend off aggressive, unhappy creditors. Although plaintiffs contend that Rudd "participated in the management" of Brad's, the evidence shows that he did so only in a limited sense. Only those decisions having an immediate effect on Brad's financial position were subject to Rudd's primary attention. He attended management meetings solely in that capacity. The record contains no evidence that he was ever substantially involved in personnel or production decisions. Rudd left the delicate task of renegotiating Government contracts to Compton. (After a Government contract had been completed, Government officials often reviewed the profits of the contracting firm, seeking the return of "excess profits.")

Fourth, Rudd's position as a required signatory on all checks drawn against the Brad's general account provides little support for plaintiffs' theory. Besides Rudd's signature, the checks also required one other signer from Brad's. Hence, Rudd again had but a veto power.

Plaintiffs argue that Rudd, using his power as a required signatory, expanded his powers into management (1) by negotiating and consummating settlements of disputed claims and (2) by designating the order in which creditors were to be paid. Once again, Compton's uncontradicted testimony illuminates the extent of Rudd's "control." Because Brad's had always been short of working capital, the practice had developed of writing checks to creditors as soon as a particular bill came due and then retaining the checks until there was money in the Brad's account to pay the checks. As could be expected, irate creditors often called upon Compton to pay up. When Rudd arrived, he and Compton worked together handling creditors. Compton testified that theirs was a cooperative effort but that, since Rudd was more skilled in dealing with creditors, he had the final decision as to which creditors were paid. The factors they considered included (1) the amount of money in the account, (2) the importance of the creditor to the continued operation of the plant, (3) the age of the bill, and (4) the urgency or fervor of a particular creditor's demand. In addition, Rudd often spoke with these creditors, attempting to forestall or to settle their demands.

Rudd's activities while at Brad's simply do not amount to active domination of the corporation. His job was to provide internal financial management assistance and all that he did was in keeping with this mission. Although he kept a fairly tight rein on disbursements, the evidence shows that his role was that of providing a centralized control over purchases and disbursements. His job was two-fold: (1) to eliminate costly duplication, e. g., multiple orders of the same supply, and (2) to eliminate all disbursements not directly and immediately re-

lated to the machine shop business. These controls were strong, and Rudd was not afraid to exercise his power, but we cannot conclude from the evidence before us that his activities could justify a jury verdict that found control. Rudd limited the scope of his position to overseeing the finances of Brad's. Neither he nor anyone else from National Distillers or from Bridgeport Brass had much, if any, influence, let alone control, over other key areas of managerial decision-making at Brad's.

In addition to Rudd's activities, plaintiffs argue that other National Distillers personnel exercised control over Brad's outside investments and production.

First, they contend that Salisbury and an assistant made the final decisions as to which assets of the "mini-conglomerate" to retain and which to liquidate. Compton testified that these efforts stemmed from Bradford's earlier request for management assistance from National Distillers and that all the proceeds were returned to Brad's to provide working capital. Although National Distillers' personnel apparently did make the final decision on the disposition of these assets, in many cases this power may be traced to the transaction in which they were assigned to National Distillers for precisely such a disposition.

Second, Compton also testified that a vice president of Bridgeport, Al Jones, visited Brad's on a weekly basis for five or six months, offering his advice and assistance wherever the production personnel at Brad's might need it. Nowhere in the record is it indicated that Jones ever exercised any control over the production process. To the contrary, his function was that of a consultant, checking data and offering his analysis. Compton specifically testified that neither Rudd nor Jones was concerned with production quantity.

These activities of both Rudd and the other are not sufficient to establish the degree of control requisite to "instrumentality" rule liability. The evidence shows that, at most, National Distillers shared managerial responsibility for some but not all aspects of the Brad's operation. That is not enough.

4. Finally, plaintiffs contend that control was shown indirectly by proving abuses of the Brad's corporation by National Distillers that could have been accomplished only with the requisite control.

First, plaintiffs complain that Rudd did not exercise his supposed veto enough. They point to Rudd-approved disbursements for a new house for Bradford, for a Mercedes automobile for the Bradford family, and for racing boats. Plaintiffs argue that these examples represent the abuse of power and control by National Distillers. In view of Rudd's limited functions at Brad's, the only fair inference that can be drawn from this configuration of "abuses of control" is that, in fact, Rudd had very little control over John Bradford.

Second, plaintiffs contend that National Distillers forced Brad's into disadvantageous brass transactions. According to plaintiffs, "freed of [National Distillers'] control, Brad's could have sold a substantial portion of its scrap for a higher price than it received from Bridgeport, and purchased a substantial portion of its rod at a lower price than it paid to Bridgeport."

Two brass contracts are involved. Purchase Order 4314 and Purchase Order 8600. According to P.O. 4314, dated September 30, 1968, Brad's agreed to purchase from Bridgeport fifteen and one-half million pounds of half-hard free cutting brass rod at $.4184 per pound. Additionally, Bridgeport agreed to repurchase brass scrap at $.2575 and $.2675 per pound, based upon a 50% return of scrap. P.O. 4314 was agreed to, and the prices fixed, nearly a year before the August 1, 1969, meeting between the representatives of Brad's and National Distillers and more than six months before the first note was executed, so no question of control arises as to its terms. P.O. 4314 remained in effect throughout the remainder of 1968, all of 1969, and until March 31, 1970.

P.O. 8600 is the second purchase order. Dated March 17, 1970, it calls for 2.8 million pounds of brass rod at $.4834 per hundredweight with scrap to be repurchased at $.3225 and $.3325 per pound.

*Brass Scrap*—Plaintiffs' argument as to the scrap is this: Although P.O. 4314 required Brad's to resell 50% of the brass as scrap to Bridgeport, it is undisputed that Brad's returned 70% of the brass as scrap, 20% more than was contractually required. Moreover, plaintiffs produced evidence tending to show that Brad's could have resold this extra scrap at a higher price than they received from Bridgeport. From these facts, plaintiffs deduce transactions that were unfavorable to Brad's. That deduction is unwarranted.

First, the timing of these transactions must be considered. According to Seitman, "the bulk" of the brass scrap was returned to Bridgeport *before* the August 1, 1969, meeting, well before the August 6, 1969, date established in the pretrial order as the beginning of the alleged domination.

Second, Seitman testified that the scrap was returned to Bridgeport voluntarily and in Brad's trucks. Most importantly, Salisbury testified, and no contradictory testimony appears in the record, that Seitman had stated that the extra return was "inadvertent." Up until October of 1969, when Seitman stopped the shipment of the extra 20%, apparently no one at Brad's realized that the scrap returns exceeded contractual requirements. Nor is there any record evidence tending to show that Bridgeport realized that it was repurchasing more scrap than was contractually bound to repurchase.

Third, after Seitman stopped shipping the extra 20%, he met with the Bridgeport and the National Distillers representatives and negotiated an adjustment. Under this adjustment agreement, Brad's would be credited at $.38 per pound for all scrap returned in November and December, 1969. This credit amounted to $117,000, which Brad's received. Although Seitman testified that he was "not particularly satisfied" with these results, the record is clear that Bridgeport and Brad's negotiated a settlement which benefited both parties. Brad's had no contractual right to be paid a higher price for the excess scrap, yet Bridgeport adjusted the scrap prices when confronted with the unfairness of the situation.

Fourth, the very nature of the fluctuating brass scrap market indicates that it was not necessarily disadvantageous to Brad's to return all of its scrap to Bridgeport. Although higher prices may have been available at times during the few months in question, employing Bridgeport as a guaranteed purchaser could be worth the price differential. As Salisbury testified, "you have got to have a home for your scrap, otherwise you will start to accumulate scrap without credit or sale, and it is so uneconomical."

*Brass Rod*—Plaintiffs argue two separate points dealing with the brass rod transactions between Brad's and Bridgeport:

As to the first contention, that Brad's purchased brass rod from Bridgeport at a higher price than was required elsewhere, plaintiffs introduced a quotation from Scoville Manufacturing Company, dated February, 1970, offering a much smaller quantity of brass at a lower price than the quantity and price finally agreed to between Brad's and Bridgeport in March, 1970. The Scoville quotation was not in reality a viable alternative source of supply. The Scoville quotation contained this requirement: "This quotation is subject to credit approval." Seitman had underlined this sentence in the original and, in May, 1970, had sent it to National Distillers with the accompanying comment "I have underlined what could have been the problem area." Testifying at the trial, Seitman explained that what he meant was that, as of February, 1970, Brad's could not have shown a good credit report.

As to plaintiffs' second contention, that Brad's failed to exploit fully its contractual rights under the first purchase order, P.O. 4314, the evidence did not establish a substantial conflict on that point. To understand plaintiffs' contention, a brief chronological analysis of the transactions involved is necessary. P.O. 4314, dated September 30, 1968, ordered fifteen and one-half million pounds of brass rod at $.4184 per pound. P.O. 4314 carried this notation: "Government contract No. DAAA09-69-C-0147." On January 12, 1970, Brad's advised Bridgeport that the contract then in production would require only 314,508 pounds more of brass rod and that Brad's was therefore initiating a change order to reduce the original order from fifteen and one-half million pounds to 13,250,250 pounds. P.O. 8600, dated March 17, 1970, ordered 2.8 million pounds of brass rod at $.4834 per pound. P.O. 8600 carried a notation different from that of P.O. 4314: "Government contract #DAAA09-70-C-0198." Thus, P.O. 8600 was for an entirely different Government contract.

The thrust of plaintiffs' contention is this: why didn't Brad's just "carry over" the more than two million pounds of excess brass rod from P.O. 4314 to the second Government contract? Since P.O. 4314 priced brass rod at a lower price, substantial savings would have resulted from such a "carry over."

There is no evidence that such a "transfer" could have been effected. Defendant's evidence indicated that these purchase orders were keyed to specific Government contracts and represented the estimated quantity of brass needed for those particular contracts. Plaintiffs failed to show that Brad's had a contractual right to the full amount of the brass rod ordered in P.O. 4314 if the particular Government contract with which it was associated was not completed.

Additionally, the time sequence shows that the option of "carrying over" from P.O. 4314 to P.O. 8600 was not available to Brad's. Although P.O. 8600 is dated March 17, 1970, the specific Government contract to which it related was open for bids in the fall of 1969. Hence, Seitman contacted Bridgeport in September, 1969, and was given a quote, the price ultimately found in P.O. 8600. Brad's winning bid, therefore, was based in part on the price quoted by Bridgeport on September 10, 1969. Since operations under the new Government contract did not start immediately, Seitman had no reason to issue a formal purchase order for the brass rod until March, 1970. Thus, by the January, 1970, quantity change in P. O. 4314, Brad's and Bridgeport had already entered into a new, separate contract for brass rod, based on a rise in the brass market, for the new Government contract. P.O. 8600 merely implemented the commitment made six months earlier.

 After considering the plaintiffs' evidence in the most favorable light, it is plain that Brad's never became an "instrumentality" of National Distillers. Although National Distillers' position as a major creditor undoubtedly vested it with the capacity to exert great pressure and influence, we agree with the District Court that such a power is inherent in any creditor-debtor relationship and that the existence and exercise of such a power, alone, does not constitute control for the purposes of the "instrumentality" rule. *See, e. g.,* Chicago Mill & Lumber Co. v. Boatmen's Bank, *supra.* Plaintiffs had to show the exercise of that control in the actual operation of the debtor corporation. Accordingly, because plaintiffs failed to produce substantial evidence of such actual operative total control, we affirm the directed verdict granted by the District Court.

Because we hold that plaintiffs failed to establish the requisite degree of control, we do not reach the question of whether the case should have been tried before a judge or before a jury.

Costs will be taxed to appellants.

Affirmed.