Jerome J. BERGER, Plaintiff-Appellee,

v.

COLUMBIA BROADCASTING SYSTEM, INC., a New York corporation, Defendant-Appellant.

No. 71-1562.

United States Court of Appeals, Fifth Circuit.

Jan. 10, 1972.

Rehearing Denied March 7, 1972.

992

William B. Killian, Miami, Fla., Eugene L. Girden, Coudert Brothers, New York City, McCarthy Steel Hector & Davis, Miami, Fla., for defendant-appellant; John M. Keene, III, Michael J. Goldey, Martin Frank, New York City, of counsel.

Hugo L. Black, Jr., Kelly, Black, Black & Kenny, P.A., Miami, Fla., for plaintiff-appellee; Thomas H. Seymour, Miami, Fla., of counsel.

Before TUTTLE, GEWIN, and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

In this diversity litigation we are confronted with an alleged breach of contract involving the syndication of a fashion spectacular entitled International Fashion Festival. We have examined the record of this long and protracted trial with the attendant findings and conclusions of a distinguished trial judge. The volumes present a play with numerous actors and many scenes. However, we find it unnecessary to review all of the legal issues raised by this pageant, for we conclude that the trial court should have realized at the end of the prologue that the curtain should have fallen on plaintiff's litigious drama.

Our story begins in Las Vegas, one of the show business capitals of the nation. There, in the spring of 1965, the plaintiff, Jerome J. Berger, was preparing to produce his International Fashion Festival, a show consisting primarily of a display of *haute couture* fashions of international designers, climaxed by the selection of a "Model of the Year" from among the designers' house models. To serve as fashion commentator for his show, plaintiff secured the services of a Miss Carol Knox, whose husband, Sam Cook Digges, was then Administrative Vice President of CBS Films, Inc., [hereinafter referred to as Films], a wholly-owned subsidiary of defendant, Columbia Broadcasting System, Inc. Sam Digges' primary responsibility in his executive position at Films was to secure distribution rights to filmed products so that the company could then syndicate such products on a national or market-by-market basis. Having become interested in the International Fashion Festival as a potential distribution property for Films, Digges informed one of the vice presidents of CBS, Inc. of plaintiff's proposed production and its possibilities for network broadcasting. CBS, Inc. then dispatched to Las Vegas Mr. Paul Levitan, director of Special Events for CBS, Inc., to scout the International Fashion Festival. Mr. Levitan and Mr. Digges, accompanied by other representatives of Films, viewed the live production of the plaintiff's show on April 1, 1965, and commented to the plaintiff that the show had definite possibilities for future network broadcasting. For the purpose of constructing a pilot film for use in selling his show, plaintiff caused wild film footage to be made of the live production. He then traveled to New York and displayed his wild film footage to representatives of Films. Thereafter, on April 30, 1965, the plaintiff and Films entered into a written licensing agreement whereby Films acquired the right to distribute the product of the wild film footage of the plaintiff's 1965 show and an exclusive right of first refusal to license the television broadcast of plaintiff's International Fashion Festival or similar type fashion show during each of the nine calendar years from 1966 through 1974. Pursuant to this contract, Films advanced the plaintiff $5,000 for expenses, and the plaintiff assembled his wild footage and other material into a pilot film of the International Fashion Festival. This film was of poor technical quality and was intended to represent only a rough draft of the potential of the show for network broadcasting.

In the late summer of 1965, while plaintiff was busying himself with arrangements for his scheduled 1966 International Fashion Festival, Mr. Stewart Cowley, operator of a model agency in New York City, approached Paul Levitan at CBS, Inc. and inquired about the possibility of producing a fashion spectacular similar to plaintiff's International Fashion Festival. Paul Levitan assisted in developing Cowley's idea, and in the fall of 1966 negotiations between Cowley and CBS, Inc. culminated in a contract pursuant to which CBS, Inc. acquired broadcasting rights to Cowley's fashion show and an exclusive right of first refusal to any similar shows produced from 1968 through 1977. Armed with this contract, Cowley obtained sponsorship for his show, which was entitled "Model of the Year" and which was similar in all material respects to the plaintiff's International Fashion Festival. Immediately prior to the 1967 broadcast of Cowley's

"Model of the Year" show, plaintiff learned for the first time of the plans of CBS, Inc., and warned the company that Cowley's show was materially similar to his own International Fashion Festival. CBS, Inc., nevertheless, proceeded with its production plans and broadcast the "Model of the Year" show in both 1967 and 1968.[1]

Thereafter, in January of 1968, Berger instituted this action against CBS, Inc. in federal district court, alleging that the defendant breached the 1965 contract entered into between plaintiff and Films, which was asserted to be the alter ego of the defendant. The parties having stipulated that the issues involved would be determined in accordance with the substantive law of the State of New York, the district judge concluded that Films was merely an instrumentality of the defendant, and he proceeded to treat the two corporations as one. With respect to the merits, the district court held that the defendant, by developing and producing Cowley's fashion show, breached the 1965 contract's implied covenant of good faith and fair dealing, and the court awarded damages in excess of $200,000.

On appeal, the defendant complains (1) that the plaintiff failed to adduce sufficient proof so as to justify invocation of New York's instrumentality rule in order to disregard the corporate identity of Films, (2) that the court below erroneously interpreted the 1965 contract, and (3) that the trial court erred in its computation of damages. Finding ourselves in complete agreement with the defendant's first assertion, we reverse the judgment of the district court. Because we conclude that neither the findings of the district court nor the evidence introduced at trial will support corporate monism, we do not reach the issues involving contractual interpretation and computation of damages.

It is elemental jurisprudence that a corporation is a creature of the law, endowed with a personality separate and distinct from that of its owners, and that one of the principal purposes for legal sanctioning of a separate corporate personality is to accord stockholders an opportunity to limit their personal liability. There does exist, however, a large class of cases in which the separateness of a corporate entity has been disregarded and a parent corporation held liable for the acts of its subsidiary because the subsidiary's affairs had been so controlled as to render it merely an instrument or agent of its parent. See generally W. Fletcher, Private Corporations § 43 (perm. ed. rev. repl. 1963). But the dual personality of parent and subsidiary is not lightly disregarded, since application of the instrumentality rule operates to defeat one of the principal purposes for which the law has created the corporation. Rapid Transit Subway Construction Co. v. City of New York, 1932, 259 N.Y. 472, 182 N.E. 145. Therefore, to justify judicial derogation of the separateness of a corporate creature, an aggrieved party must prove something more than a parent's mere ownership of a majority or even all of the capital stock and the parent's use of its power as an incident of its stock ownership to elect officers and directors of the subsidiary. Stone v. Cleveland C. C. & St. L. Ry., 1911, 202 N.Y. 352, 95 N.E. 816; Gonzales v. Ametek, Inc., 1966, 50 Misc.2d 62, 269 N.Y.S.2d 616.

In formulating a basis for predicating liability of a parent corporation for the acts of its subsidiary, courts have developed various legal theories and descriptive terms to explain the relationship between a subsidiary and its dominating parent. For example, under the "identity" theory the separate corporate entity of the dominated subsidiary is disregarded and the parent and subsidiary are treated as one corporation. See United States v. Lehigh Valley R.R., 1911, 220 U.S. 257, 31 S.Ct. 387, 55 L.Ed. 458. Furthermore, a dominated subsidiary has been labeled an instrument, agent, adjunct, branch, dummy, department, or tool of the parent corporation. See, e. g.,

---

1. This factual recitation is a condensation of the findings of the district court.

New York Trust Co. v. Carpenter, 6 Cir. 1918, 250 F. 668. In Lowendahl v. Baltimore & O. R.R., 1936, 247 App.Div. 144, 287 N.Y.S. 62, aff'd, 272 N.Y. 360, 6 N.E.2d 56, a New York court analyzed the various terms and legal theories and concluded that the instrumentality rule furnished the most practical theory for toppling a parent corporation's immunity. The court in *Lowendahl* then postulated the following three elements as the quantum of proof necessary to sustain application of the instrumentality rule:

"(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

"(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

"(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of."

287 N.Y.S. at 76.

■ Applying these three elements to the relationship between the defendant and Films in the case at bar, we first turn to the lower court's factual determinations. The district court held that at all relevant times Films was merely an instrumentality of the defendant based on the following findings: (1) the board of directors of Films consisted solely of employees of the defendant; (2) the organization chart of CBS, Inc. included Films; and (3) all lines of employee authority from Films passed through employees of the defendant and other subsidiaries to the chairman of the board of CBS, Inc. In addition, the trial judge was greatly influenced by the fact that several witnesses, including a comptroller of one of the defendant's subsidiaries, testified that Films was a "division" of CBS, Inc. Comparing these several facts to the requisite quantum of proof necessary to satisfy *Lowendahl's* "control" element, we think it is obvious that these factual determinations, standing alone, are insufficient to sustain application of the instrumentality rule. Moreover, an independent examination of the record in this case convinces us that the evidence adduced below concerning the relationship between the defendant and Films could not sustain any finding that the defendant completely dominated not only the finances, but the policy and business practice of Films.

■ Without considering for the moment the testimony concerning Films' status as a "division" of the defendant, the findings of the district court deal exclusively with the existence of the defendant's potential to control or dominate its subsidiary Films. In our opinion complete stock ownership, common officers and directors, and the use of organizational charts illustrating lines of authority are all business practices common to most parent-subsidiary relationships, and such proof of a parent's potential to dominate its subsidiary is precisely the kind of evidence that New York courts have consistently rejected as insufficient in proving a community of management between corporations. *See, e. g.,* Berkey v. Third Ave. Ry., 1926, 244 N.Y. 84, 155 N.E. 58; Stone v. Cleveland C. C. & St. L. Ry., *supra;* Lowendahl v. Baltimore & O. R.R., *supra.* Furthermore, with respect to the testimony concerning Films' status as a division of the defendant, we think this evidence under New York law is equally unpersuasive. Affixing labels to corporate relationships for purposes of showing a parent's complete domination of a subsidiary is a dangerous business. As Justice Cardozo, speaking for the New York Court of Appeals in Berkey v. Third Ave. Ry., *supra,* 155 N.E. at 61, stated:

"The whole problem of the relation between parent and subsidiary corporations is one that it still enveloped in the mists of metaphor. Metaphors

in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it. We say at times that the corporate entity will be ignored when the parent corporation operates a business through a subsidiary which is characterized as an 'alias' or a 'dummy.' All this is well enough if the picturesqueness of the epithets does not lead us to forget that the essential term to be defined is the act of operation."

Thus, courts have employed various labels or metaphors to describe those certain corporate relationships in which the underlying facts reveal that a parent corporation has completely dominated the business practices of its subsidiary. For such purposes epitomical terminology is useful. But when a lay witness testifies that one corporation is a division of another, then individual thought indeed becomes enslaved for a court to assume that the use of a descriptive term, by some process of testimonial osmosis, automatically introduces into evidence a composite of facts tending to show a community of management. Just as siamesing is a biological fact, so must corporate umbilication be anatomically demonstrated under New York law. For purposes of application of the instrumentality rule, descriptive characterization is simply not an adequate alternative to a factual showing of the essential "act of operation."

■ Our perquisition of the record in this case reveals that the evidence concerning the defendant's "act of operation" is totally insufficient to sustain any possible finding that, with respect to the transaction attacked, Films possessed at the time no separate mind, will, or existence of its own.[2] The only evidence tending to show the defendant's actual participation in the business of its subsidiary is the deposition testimony of Films' general manager. As stated in plaintiff's brief, the general manager admitted that "he answers directly to the President of CBS Television Services Division who answers directly to the Presi-

2. It is noteworthy that the evidence adduced at the trial concerning the relationship between the defendant and Films resulted solely from the direct and cross examination of the plaintiff's witnesses. After the plaintiff rested his case the trial court rejected the defendant's offer of evidence relating to its denial of corporate amalgamation in the following terms:

"THE COURT: What evidence do you have? It is a matter of law.

MR. GIRDEN: We did not go into the matter fully when Mr. Diggs testified. Mr. Diggs was the operating head of CBS Films, Inc. We did not go into it with him on the delineation between the two corporate entities, which we deal with in our memorandum of law, too.

If we have to rebut this position, and we still say there is not one iota of evidence put in by the plaintiff on this point, I will probably have to call down the now operating head—

THE COURT: For what? What are you going to put in in that way? What are you going to ask him?

MR. GIRDEN: To prove that the acts of CBS Films cannot be imputed to the liability of CBS, Inc., under this cause of action.

THE COURT: That is a matter of law. That is not a matter of fact.

MR. GIRDEN: But there are facts from which it can be drawn.

THE COURT: Like what facts? That Mr. Diggs has not testified to?

MR. GIRDEN: The fact that CBS Films, Inc., was in competition with CBS, Inc.

THE COURT: Let us even assume that. What difference does that make?

MR. GIRDEN: This would be a separate corporate entity selling to all networks and having made virtually no sales ever to CBS Television Network. I think there was one in 1958.

MR. BLACK: Your Honor, the fact of the matter is Mr. Girden has admitted that CBS Films, Inc., is operated by employees of CBS.

THE COURT: That is already in.

MR. BLACK: Operating in the line and scope of their employment.

THE COURT: I know that. That is already in the thing.

MR. BLACK: What can he show? He has had it on that issue.

THE COURT: I am going to think about this overnight. You do not have to bring on any evidence. Let us go on whatever else you have got."

dent of the CBS/COMTEC Group who answers directly to the Vice President of CBS who answers directly to the President of CBS." In our opinion, however, all of this "answering" is insignificant. This testimony relates to the present-day relationship between the defendant and Films, and New York law requires "that the unlawful control must be shown to have been exercised at the time the acts complained of took place." Lowendahl v. Baltimore & O. R. R., *supra*, 287 N.Y. S. at 76–77. Furthermore, the only evidence concerning the corporate relationship during the period in which the transaction involved herein occurred negates any assertion that Films was being operated as the alter ego of the defendant. The uncontradicted testimony of Mr. Sam Cook Digges, former administrative vice president of Films, is as follows:

"Q What was the relationship of CBS Films, Inc. to CBS Television Network?

A Many of the programs that were telecast on the CBS Television Network eventually went into distribution through CBS Films. Those shows were distributed concurrently with the network run overseas. In other words, when Perry Mason was being telecast in this country, on the network at the same time we were selling it in some 80 countries overseas. After Perry Mason again, for example, came off the network, we distributed it in this country market by market.

Q For what period of time did you act as the administrative vice-president or operational head of CBS Films, Inc.?

A From 1959 to 1967.

Q In this eight-year period, Mr. Digges, did you ever sell a program from CBS Films, Inc., to CBS for network broadcast?

A Yes, we did. We sold many of the Terry-Toon products in the Saturday morning kid block.

We also sold a program when we were in the production end of the business also producing shows called Angel. This was a program that was produced by Jess Oppenheimer, who developed the Lucy series. Angel was on the CBS Television Network for one year. It was on Thursday night. That was a pretty bad night for CBS. It had the highest rating of any show on Thursday night, but that wasn't good enough.

We made a number of network pilots, attempted them. We made four or five high budget network pilots and attempted to sell them to CBS.

Q Did you make any sales to CBS?

A Not except for the Angel show.

Q Did you make any sales to any other network?

A Yes. The sale was made prior to the time I joined CBS, but the show was still running when I was there. That was a program called Navy Log, which was sold to ABC.

We also sold a show called the Children's Doctor, which is a five-minute medical series, a pediatrician, to the ABC Television Network.

Q Is there any contractual commitment for the network to broadcast any product that is produced by CBS Films, Inc.?

A No, there isn't. My life would have been easier if there had been such an arrangement.

Q Of the properties that CBS Films, Inc., would be distributing, was there any obligation on the part of CBS Films, Inc., to sell it to the CBS Television Network?

A No, there was not."

Faced with both this testimony and the total absence of any evidence showing the defendant's actual domination of its subsidiary Films during the period in which the plaintiff's contract was executed and allegedly breached, this court has no alternative but to reverse the decision of the district court on the simple basis that plaintiff has failed to prove, in accordance with New York law, that Films was the alter

ego of the defendant. We reiterate that under the substantive law of the State of New York a parent's potential to dominate its subsidiary is insufficient to justify application of the instrumentality rule. New York law respects corporate identity, and its destruction by piercing or surrogation requires substantiation of facts, not just organizational charts and labels. The instrumentality referred to in New York cases requires a specific kinetic result, and muscularity to effectuate such result must be demonstrated. Plaintiff's omission in proving such muscularity constitutes his failing.

The judgment of the district court is reversed.