### JOSLYN CORPORATION

v.

### T.L. JAMES & COMPANY, INC. et al.

### Civ. A. No. 87–2054.

United States District Court,
W.D. Louisiana,
Shreveport Division.

Sept. 19, 1988.

---

Robert E. Holden, J. Berry St. John Jr., William Craig Wyman, Liskow & Lewis, New Orleans, La., James W. Hailey Jr., Hailey, McNamara, Hall, Larmann & Papale, Metairie, La., Liskow & Lewis, Lafayette, La., for plaintiffs.

Robert G. Dawkins, Dawkins, Coyle & Carter, Stephen J. Weiss and Donald B. Mitchell, Arent, Fox, Kintner, Plotkin and Kahn, Washington, D.C., for T.L. James & Co., Inc.

Bobby S. Gilliam, Wilkinson, Carmody & Gilliam, Shreveport, La., for La. & Ark. Ry. Co.

James B. Gardner, Lunn, Irion, Johnson, Salley & Carlisle, Shreveport, La., for Commercial Union Ins. Co.

Philip C. Stahl, Katherine E. Rakowsky, Grippo & Elden, Chicago, Ill., Redoux R. Provosty Jr., F. Rae Swent, Provosty, Sadler & deLaunay, Alexandria, La., for Nat. Sur. Corp.

J. Fleet Howell, Wiener, Weiss, Madison & Howell, Shreveport, La., for Koppers Co., Inc.

David F. Butterfield, Mayer, Smith & Roberts, Shreveport, La., for Powerline Supply Co.

Kevin M. Ward, Michael C. Donovan, Charles Kevin Cahill, Denver, Colo., James L. Adans, Kennedy, Goodman & Donovan, Shreveport, La., for Lance D. Allworth: (defendant & third party).

James L. Nelson, Shreveport, La., for Graham W. Rogers and John Walker Price: (third parties).

Gary M. Zwain, Duplass, Witman & Zwain, Metairie, La., for Wesley D. Burdine: (third party).

Jerald Harper, Cook, Yancey, King & Galloway, Shreveport, La., for David Myatt: (third party).

## MEMORANDUM RULING

STAGG, Chief Judge.

Joslyn Corporation (hereinafter "Joslyn") initiated this action against, *inter alia*, T.L. James & Company, Inc. (hereinafter "T.L. James" or "James Company"), asserting an action under the Comprehensive Environmental Response, Compensation and Liabil-

ity Act (hereinafter "CERCLA")[1] and the Louisiana Environmental Quality Act (hereinafter "LEQA").[2] The suit was instituted by Joslyn after the Louisiana Department of Environmental Quality had issued several orders to certain parties, including Joslyn, requiring the investigation and cleanup of a contaminated site in Bossier Parish, Louisiana that was formerly a wood-treating and/or creosoting operation. The claims, cross claims, counterclaims and third party demands involved in this action are too numerous to list.

Presently under advisement are the following:

1. T.L. James's motion and renewed motion to dismiss plaintiff's complaint or, in the alternative, for summary judgment;

2. T.L. James's motion and renewed motion to dismiss the cross claim of Powerline Supply Company;

3. T.L. James's motion to dismiss the cross claim of the Louisiana and Arkansas Railway Company for failure to state a claim or, in the alternative, for summary judgment;

4. T.L. James's motion to dismiss the counterclaim of Lance D. Alworth; and

5. T.L. James's motion to dismiss the amended cross claim of Lance D. Alworth.

Though these motions present several issues, they all request the court to determine whether CERCLA imposes direct liability upon a parent corporation or requires a claimant to pierce the corporate veil before liability may attach. A recitation of material facts will be deferred until the court completes its analysis of this legal issue.

## DIRECT OR DERIVATIVE LIABILITY?

Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides, in relevant part:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this Section—

\*   \*   \*   \*   \*   \*

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of [shall be liable under this Section].

Under 42 U.S.C. § 9601(20)(A), the term "owner or operator" means "in the case of an onshore facility or an offshore facility, any person owning or operating such facility." "Person" includes an "individual, firm, corporation, association, partnership ... commercial entity...." *Id.* at § 9601.

Joslyn[3] argues that T.L. James must be deemed an "owner or operator" under CERCLA § 107(a) and is, therefore, directly liable. CERCLA does not specifically address the question of whether a court may hold a parent corporation or corporate officers liable for clean-up costs without first piercing the corporate veil. Several courts addressing the issue have held that corporate officers may be individually liable for hazardous waste clean-up under CERCLA.[4] The undersigned respectfully declines to adopt the analysis utilized by these courts because they have

---

1. 42 U.S.C. §§ 9601–9657 (1982) and (Supp. V 1987), *as amended by* Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99–499, 100 Stat. 1613 (1986).

2. La.Rev.Stat. 30:1051 *et seq.*

3. For the sake of brevity, reference will only be made to Joslyn's position which has been adopted by all the nonmoving parties against whom motions are presently under consideration.

4. *State of New York v. Shore Realty Corp.*, 759 F.2d 1032 (2d Cir.1985); *United States v. Ward,* 618 F.Supp. 884 (E.D.N.C.1985); *United States v. Conservation Chemical Company* 619 F.Supp.

162 (W.D.Mo.1985); *United States v. Mottolo,* 605 F.Supp. 898 (D.N.H.1985); *United States v. Carolawn Company,* 21 Env't Rep. Cas. (BNA) 2124 (D.S.C.1984); *United States v. Northeastern Pharmaceutical & Chemical Company (NEPAC-CO),* 579 F.Supp. 823 (W.D.Mo.1984), *affirmed in part, reversed in part,* 810 F.2d 726 (8th Cir. 1986); *United States v. Wade,* 577 F.Supp. 1326 (E.D.Pa.1983). Also, in *Idaho v. The Bunker Hill Company,* 635 F.Supp. 665 (D.Id.1986), liability was imposed, without piercing the corporate veil, under CERCLA on a parent corporation held to be the "owner or operator" of a disposal facility.

chosen to ignore the corporate form without an express congressional directive.

In *Berger v. Columbia Broadcasting System, Inc.*, 453 F.2d 991, 994 (5th Cir. 1972), the Fifth Circuit made clear the importance of the corporate structure:

> It is elemental jurisprudence that a corporation is a creature of the law, endowed with a personality separate and distinct from that of its owners, and that one of the principal purposes for legal sanctioning of a separate corporate personality is to accord stockholders an opportunity to limit their personal liability.

*See also, Baker v. Raymond International, Inc.*, 656 F.2d 173, 179 (5th Cir.1981) ("[t]he principle of limited liability remains a dominant characteristic of American corporate law."), cert. denied, 456 U.S. 983, 102 S.Ct. 2256, 72 L.Ed.2d 861 (1982); and *Krivo Industrial Supply Company v. National Distillers and Chemical Corp.*, 483 F.2d 1098, 1102 (5th Cir.1973) ("the corporate form ... is not lightly disregarded since limited liability is one of the principal purposes for which the law has created the corporation."). In *Cort v. Ash*, 422 U.S. 66, 84, 95 S.Ct. 2080, 2090, 45 L.Ed.2d 26 (1975), the Supreme Court refused to create a federal private right of action for allegedly illegal corporate campaign contributions, holding that:

> Corporations are creatures of state law, and investors commit their funds to corporate directors on the understanding that, except where federal law expressly requires certain responsibilities of directors with respect to stockholders, state law will govern the internal affairs of the corporation.

In *Homan & Crimen, Inc. v. Harris*, 626 F.2d 1201, 1205 (5th Cir.1980), cert. denied, 450 U.S. 975, 101 S.Ct. 1506, 67 L.Ed.2d 809 (1981), Medenco, Inc. owned 100 per cent of the stock of Homan & Crimen, Inc., an unrelated corporation doing business as Southwestern General Hospital. The hospital submitted its Medicare cost reports for two years, claiming $830,000 as a step-up in the cost basis of its assets. *Id.*[5] These were costs incurred by Medenco, Inc. In claiming entitlement to this amount, plaintiffs argued under 42 C.F.R. § 405.427 that "costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common *ownership or control* are includable in the allowable cost to the provider at the cost to the related organization." *Id.* at 1208 (emphasis added).

Based upon this regulation, Homen & Crimen contended that "form should not be exalted over substance and the fiction of the separateness of the corporation and its shareholders should not be used to reach an unfair and unjust result." *Id.* The United States Court of Appeals for the Fifth Circuit rejected this argument:

> To this contention, the response must be that if the separateness of the corporation and its shareholders is a fiction, it is one which the law has long recognized and will not lightly go behind. [Citations omitted.] *For the regulation to cut through or ignore that mass of established corporate law upon which the Secretary relied would require at the very least a clear intention, a compelling case. It cannot be done by implication as plaintiffs suggest here.*

*Id.* (emphasis added.) Stated differently, "[w]hether latent federal power should be exercised to displace state law is primarily a decision for Congress." *Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966). "Even where there is related federal legislation in an area, as is true in this instance, it must be remembered that 'Congress acts ... against the background of the total corpus juris of the states....'" *Id.*, quoting from Hart and Wechsler, *The Federal Courts and the Federal System* at p. 435 (1953).[6]

---

5. *See,* 42 U.S.C. §§ 1395X and 1395F.

6. *See also, Burks v. Lasker,* 441 U.S. 471, 478–79, 99 S.Ct. 1831, 1837–38, 60 L.Ed.2d 404 (1979) (holding that in actions asserting violations under the Investment Company Act and the Investment Advisers Act, federal courts must apply state corporate law governing the authority of independent directors to discontinue shareholders' derivative actions because corporate law is not an area in which these statutes authorize

■ Based upon the foregoing authorities, this court holds that the corporate form, including limited liability for shareholders, is a doctrine firmly entrenched in American jurisprudence that may not be disregarded absent a specific congressional directive. Neither the clear language of CERCLA nor its legislative history provides authority for imposing individual liability on corporate officers or direct liability on parent corporations.[7] Though it is recognized that CERCLA was enacted in the "waning hours of the 96th Congress," and was "the product of apparent legislative compromise [that] is not a model of clarity," *Tanglewood East Homeowners v. Charles–Thomas, Inc.,* 849 F.2d 1568, 1572 (5th Cir.1988), this court will not read into the statute a provision disregarding decades of corporate law. The court's conclusion is buttressed by the fact that Congress has, in the past, specified that shareholders or controlling parties are to be held responsible for the acts or debts of a valid corporation. *See, e.g.,* Depository Institution Management Interlocks Act, 12 U.S.C. §§ 3201–3207; I.R.C. § 1239(b)(2), (3) (1976); Fair Labor Standards Act § 3(r), 29 U.S.C. § 203(r); and ERISA § 4001(b), 29 U.S.C. § 1301(b)(1); *see also,* 16 C.F.R. § 15.482 (1981). Absent a similar provision in CERCLA, this court finds no direct liability against James Company.

### THE RULE OF DECISION

It is undisputed that federal law governs in actions arising under nationwide federal programs. *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979). The question is whether state law should be adopted as the rule of decision or whether

federal common law should control. As the Supreme Court has noted:

> That the statutes authorizing these federal lending programs do not specify the appropriate rule of decision in no way limits the reach of federal law. It is precisely when Congress has not spoken "in an area comprising issues substantially related to an established program of government operation, [citation omitted,] that *Clearfield [Trust Company v. United States,* 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943)] directs federal courts to fill the interstices of federal legislation according to their own standards."

440 U.S. at 727, 99 S.Ct. at 1458, *quoting from* Mishkin, *The Variousness of "Federal Law": Competence and Discretion and the Choice of National and State Rules for Decision,* 105 U.Pa.L.Rev. 797, 800 (1957). The normal course of analysis would require this court to apply the test set forth in *United States v. Kimbell Foods, Inc., supra,* as explained by *Georgia Power Company v. Sanders,* 617 F.2d 1112 (5th Cir.1980) (*en banc*), *cert. denied,* 450 U.S. 936, 101 S.Ct. 1403, 67 L.Ed.2d 372 (1981). This inquiry, however, is unnecessary because the Fifth Circuit has held:

> [W]e find no need to determine whether a uniform federal alter ego rule is required, since the federal and state alter ego tests are essentially the same. Our non-diversity alter ego cases have rarely stated whether they were applying a federal or state standard, and have cited federal and state cases interchangably.

*United States v. Jon–T Chemicals, Inc.,* 768 F.2d 686, 690 n. 6 (5th Cir.1985), *cert. denied,* 475 U.S. 1014, 106 S.Ct. 1194, 89 L.Ed.2d 309 (1986) (citations omitted)[8].

---

federal courts to "fashion a complete body of federal law); *Pipefitters Local Union No. 562 v. United States,* 407 U.S. 385, 413–14, 92 S.Ct. 2247, 2263–64, 33 L.Ed.2d 11 (1972) (refusing to pierce veil of union political fund despite evidence of control and domination, in view of compliance with formal statutory requirements).

**7.** Comment, *Corporate Officer Liability for Hazardous Waste Disposal: What Are the Consequences?,* 38 Mercer L.Rev. 677, 679 (1987).

**8.** For a view that state alter ego, as opposed to federal common law, will conflict with the purposes of CERCLA, *see,* Note, *Liability of Parent Corporations for Hazardous Waste Cleanup and Damages,* 99 Harv.L.Rev. 986 (1986). Though the Court in *Jon–T* was faced with Texas law, the undersigned is satisfied that the principles utilized in this opinion would control whether Louisiana or federal common law governs. *See, infra,* at 232–33.

The Fifth Circuit in *Jon–T Chemicals* then proceeded to set forth general standards of piercing the corporate veil that have evolved in this circuit. In *Krivo Industrial Supply Company v. National Distillers & Chemical Corp.*, 483 F.2d 1098, 1102 (5th Cir.1973), the Fifth Circuit noted: "[o]ne of the most difficult applications of the rule permitting the corporate form to be disregarded arises when one corporation is sought to be held liable for the debts of another corporation." Unless the parent corporation expressly or impliedly assumes responsibility for the debts of the subsidiary, liability will attach only when the parent "misuses that corporation by treating it, and by using it, as a mere business conduit for the purposes of the dominant corporation." *Id.* Two elements are held to be essential:

First, the dominant corporation must have controlled the subservient corporation, and second, the dominant corporation must have proximately caused plaintiff harm through misuse of this control.

*Id.* at 1103, *citing, inter alia, Berger v. Columbia Broadcasting System, Inc.*, 453 F.2d 991 (5th Cir.), *cert. denied*, 409 U.S. 848, 93 S.Ct. 54, 34 L.Ed.2d 89 (1972). The Court further held:

The control required for liability ... amounts to total domination of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation.

*Krivo*, 483 F.2d at 1106. In so holding, the Fifth Circuit adopted the recommendation of Professor Fletcher:

The control necessary to invoke what is sometimes called the 'instrumentality rule' is not mere majority or complete stock control but such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal.

*Id., quoting from* 1 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 43 (Perm. ed. rev. 1963). *See also, Jon–T*

*Chemicals*, 768 F.2d at 691; and *Baker v. Raymond International, Inc.*, 656 F.23d 173, 180 (5th Cir.1981). In determining whether a parent corporation has exercised the requisite degree of control over a subsidiary to pierce the corporate veil, the Fifth Circuit has developed a laundry list of factors. These include whether:

(1) the parent and the subsidiary have common stock ownership;

(2) the parent and the subsidiary have common directors or officers;

(3) the parent and the subsidiary have common business departments;

(4) the parent and the subsidiary file consolidated financial statements and tax returns;

(5) the parent finances the subsidiary;

(6) the parent caused the incorporation of the subsidiary;

(7) the subsidiary operates with grossly inadequate capital;

(8) the parent pays the salaries and other expenses of the subsidiary;

(9) the subsidiary receives no business except that given to it by the parent;

(10) the parent uses the subsidiary's property as its own;

(11) the daily operations of the two corporations are not kept separate; and

(12) the subsidiary does not observe the basic corporation formalities, such as keeping separate books and records and holding shareholder and board meetings.

*Jon–T Chemicals*, 768 F.2d at 691–92 (citations omitted). Resolution of the alter ego issue is "heavily fact-specific" and requires an evaluation of the totality of the aforementioned factors. *Id.* at 694.

### THE FACTS

This dispute is over the materiality of facts, not their existence. Lincoln Creosoting Company, Inc. (hereinafter "Lincoln") was incorporated in the State of Louisiana on December 4, 1935. The idea to form Lincoln came from Messrs. Tooke and Hayes, who approached Mr. T.L. James. Mr. James paid $20,110 for 120 shares of voting common stock of Lincoln and 200

shares of non-voting preferred stock. C.A. Tooke and J.R. Hayes received 40 shares each of the voting common stock of Lincoln for a total of 40 per cent of the Lincoln stock. All outstanding stock certificates, however, were accompanied by endorsements back to James Company. The endorsements of Tooke and Hayes were to the effect that they have endorsed the stock to T.L. James "where it shall remain until such time as their earnings from dividends on the stock shall have repaid the par value of the stock."[9] Since Lincoln never paid any common stock dividends, James Company had control over 100 per cent of Lincoln's stock.

Lincoln's first board of directors consisted of seven members: Mr. T.L. James, Mrs. T.L. James Jr., Mr. G.W. James, Mr. Floyd B. James, Mr. C.A. Tooke, Mr. J.R. Hayes and Mr. V.A. Davidson. Excluding Messrs. Tooke and Hayes, all were officers, directors and/or shareholders of T.L. James & Company. At the first meeting of the Lincoln Board of Directors, Mr. Tooke, who was vice president of Lincoln, was designated as general manager with full power and discretion to conduct the corporation's affairs.

The property at issue in this suit was purchased in Lincoln's name on December 17, 1935. At least since 1936, Lincoln had its own bank account at the Commercial National Bank in Shreveport. Checks were signed jointly by Messrs. Tooke and Hayes. From its inception, Lincoln frequently and periodically held separate meetings of the directors and shareholders. At the annual shareholders meetings, Mr. Tooke was responsible for making the report of the preceding year and outlining policy for the coming year.

Mr. T.L. James died in July of 1944. On September 11, 1944, the Lincoln directors met and chose Mr. G. William James as the successor-president of Lincoln. Mr. G. William James served as president of Lincoln from 1944 through 1950.

In 1943 and 1944, Lincoln lost money. In the summer or fall of 1944, Mr. G.W. James approached J.E. Lacy concerning employment with Lincoln. James offered Lacy $1,000 a month for three months to "go over there [to Lincoln] and see what was the matter with this plant, why it wasn't making any money."[10] Lacy accepted the job and worked for three weeks. Lacy surmised that the problem at Lincoln was an internal fight between Messrs. Tooke and Hayes. According to Lacey, "Hayes' ambition was to get out and get a plant of his own. So he was not doing the things he should be doing, and that left Tooke with the inability to make the plant operate properly."[11]

Subsequent thereto, Lacy was employed by Lincoln. This came about after G.W. James bought out Hayes' interest. Lacy was placed in charge of production. Lacy, however, was only on Lincoln's payroll and not that of T.L. James & Company. At a shareholders meeting on March 13, 1945, a resolution was passed thanking Hayes for his service to Lincoln and noting that Hayes was "the originator of the ideas which developed Lincoln."[12] At the same meeting, G.W. James was reelected president and Tooke was reelected vice president. V.A. Davidson was elected secretary, replacing Mr. Hayes.

At a directors meeting on October 8, 1945, a new resolution was passed pursuant to which Messrs. Tooke, Lacy and Plummer were authorized to sign checks on behalf of Lincoln.

At a special shareholders meeting on March 3, 1947, the number of directors was increased to eight. Four of these were Lincoln employees and four were affiliated

9. This is evidenced by a letter from J.C. Love Jr. of T.L. James to the vice president of the National Surety Corporation dated May 25, 1948. The letter goes on to state: "While actually T.L. James & Company only owns 60 per cent of the capital stock, they do, as of this time, control the full 100 per cent and will continue to do so until such time as dividends may have repaid all the original value of 40 per cent owned by the operators." Joslyn Exhibit 8.

10. Deposition of Lacy at 15, Joslyn Exhibit 15.

11. *Id.* at 16.

12. *See* Attachment "C" to T.L. James' Statement of Undisputed Facts at 67.

with James Company. The four Lincoln employees were Tooke, Freeman, Lacy and Plummer.

A special board meeting was held on December 29, 1947, at which time it was agreed that due to rather substantial obligations of Lincoln, it would not be advisable to consider any common stock dividends on account of the 1947 earnings. Upon the motion of J.C. Love, however, it was agreed that $20,000 be presented to Centenary College toward the T.L. James Memorial Fund.

At the regular annual meeting of stockholders on March 9, 1948, Tooke reported that the "future of the treating business is rather a vague picture." [13] The vagueness was due to the declining demand for creosoted products as the result of consumers' inability to secure wire and transformers. In addition, the creation of new creosoting plants was noted to have caused the supply of creosoted items to be unreasonably large. Despite this, Tooke stated his belief that the 1948 operations would be profitable. G.W. James commented at this meeting that he felt "the management of the creosoting business was to be commended for assuming such a logical attitude with reference to the forthcoming problems." [14]

At a special directors meeting held on December 16, 1949, a resolution was passed granting authority to any two among C.A. Tooke (vice president), H.R. Freeman (director) and W.W. Colbert (purchasing agent) to make withdrawals from Lincoln's corporate account at Commercial National Bank in Shreveport. This resolution was approved by G.W. James and Mr. Davidson.

Mr. Tooke died on May 4, 1950. As a result, a special meeting of Lincoln's Board of Directors was held on May 15, 1950. G.W. James stated that he "felt very keenly the loss of not only the sincere friendship, but the keen business judgment of C.A. Tooke." [15] Mr. James further stated that the purpose of the meeting was to try to decide what course should be followed without the leadership of Mr. Tooke. James stated that: "As everyone knew, Lincoln Creosoting Company had originally been organized through the efforts of Mr. Tooke and that it had been the attitude of those in Ruston that it was Mr. Tooke's enterprise and had been since it was first organized." Without the leadership of Mr. Tooke, it was G.W. James' opinion and the opinion of those in Ruston that the business should be sold. It was agreed at the meeting that every effort should immediately be made to sell Lincoln. In the event that a purchaser could not be secured, it was agreed that plans would be made for an orderly liquidation. Since Mr. Lacy was most familiar with the general management of the business, it was agreed that he would assume the position formerly held by Mr. Tooke. It was then approved that Lacy's name would be added to the list of names of any two required signatures to withdraw funds from Lincoln's account. Floyd B. James stated that, "it was his opinion and that of the members he had spoken with that the corporation was indebted to Mr. Tooke for the development of the corporation from its infancy to its present status and that in view of these facts he moved that the corporation pay to Mrs. Tooke, the widow of C.A. Tooke, his salary for a period of twelve months...." [16]

A special meeting of stockholders was held on July 20, 1950 for the purpose of considering the sale of Lincoln's principal assets. Mr. Lacy outlined a proposition to purchase Lincoln that had been made by Joslyn Manufacturing & Supply Company. After a general discussion of the proposal, a resolution was introduced by Mr. Plummer which authorized G.W. James to execute a memorandum agreement with Joslyn Manufacturing & Supply Company for the sale of Lincoln's physical plant and real estate, the entire black stock inventory, the entire white stock inventory, the entire stock of creosote oil and the entire account

13. *Id.* at 84.

14. *Id.* at 85.

15. *Id.* at 98.

16. *Id.* at 99.

of usable transient freight. This resolution was unanimously adopted by the Board of Directors on July 20, 1950.

The shareholders voted on December 27, 1950 to repurchase as treasury stock 41 shares of common stock held by Messrs. Lacy, Freeman and Plummer, and the Tooke heirs. The shareholders also agreed that all 200 shares of preferred stock held by James Company, which were the original capitalization of Lincoln, should be redeemed at par value of $100 a share plus accrued dividends to the next dividend date.

At the March 20, 1951 annual meeting of the Board of Directors, Lacy advised that the transfer of Lincoln's properties to Joslyn Manufacturing Company was nearly complete and that all miscellaneous items of charge and credit had been settled. The only matter remaining to consummate the sale was the payment of the monthly amount, as provided for in the memorandum agreement. Mr. Lacy then summarized outstanding business matters to be resolved and stated that, in his estimation, the entire affairs of the creosoting company should be completed well in advance of the close of the 1951 calendar year. The same eight directors who had served since 1947 were reelected, with the exception of C.A. Tooke Jr., who was elected to replace the late C.A. Tooke.

On November 26, 1951, the shareholders of T.L. James & Company, Inc. held a special meeting "to consider the desirability ... of mak[ing] a contribution or donation from T.L. James & Company, Inc. to Centenary College of Louisiana ... consisting of all shares of stock of Lincoln Creosoting Company, Inc. presently owned" by

James Company.[17] A resolution was unanimously passed authorizing this donation. The James Company Board of Directors approved this resolution on December 10, 1951.

On December 19, 1952, a Certificate of Dissolution was signed dissolving Lincoln. According to the Certificate, "all debts, obligations and liabilities of this corporation have been paid and discharged," that "there are no suits pending against this corporation in any Court," and that the assets have been distributed to the shareholders "in accordance with their respective rights and interests."[18]

## ANALYSIS OF LAW AND FACTS

■ Joslyn urges that six of the twelve factors cited in *Jon–T Chemicals, supra,* support the conclusion that the corporate veil should be pierced. Specifically, Joslyn points out that the parent and subsidiary have common stock ownership as well as common directors. It is further urged by Joslyn that the positions held by G.W. James and Mr. Davidson constituted direct control over Lincoln's finances.[19] These facts are undoubtedly true and material:

> Nevertheless, our cases are clear that 100 per cent ownership and identity of directors and officers are, even together, an insufficient basis for applying the alter ego theory to pierce the corporate veil. [Citing *Nelson v. International Paint Company,* 734 F.2d 1084, 1092 (5th Cir.1984) and *Miles v. AT & T,* 703 F.2d 193, 195 (5th Cir.1983).] Instead, we maintain the fiction that an officer or director of both corporations can change

---

17. *See,* Attachment "D" at 195 to T.L. James' Statement of Undisputed Facts.

18. Attachment "A" to T.L. James' Statement of Undisputed Facts.

19. In support of this contention, Joslyn refers to two letters from G.W. James and V.A. Davidson to their accountant. The letters were written in regard to an IRS audit concerning these individuals' salaries from Lincoln. Contained in the letters are statements that these directors were consistently involved in the financial affairs of Lincoln, and that Mr. Davidson served as a contact between plant personnel and G.W.

James. Though these letters evidence minimal control in financial affairs, they bear no weight in determining control over the nuts and bolts of Lincoln's operations and the day-to-day affairs. It must be remembered that the corporate veil will not be pierced unless the parent's control "amounts to total domination of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interest of its own and functions solely to achieve the purposes of the dominant corporation. *Krivo,* 483 F.2d at 1106. "Merely taking an active part in the management of the debtor corporation does not automatically constitute control...." *Id.* at 1105.

hats and represent the two corporations separately, despite their common ownership.

*Jon–T Chemicals,* 768 F.2d at 691; *see also, Baker,* 656 F.2d at 180 ("Ownership of a controlling interest in a corporation entitles the controlling shareholder to exercise the normal incidence of stock ownership ... without forfeiting the protection of limited liability."); and *Berger,* 453 F.2d at 994 (same).

Joslyn also points out that James Company made substantial loans to Lincoln, including the initial capitalization. The uncontroverted record establishes, however, that these loans were repaid. In any event, "the general rule is that the mere loan of money by one corporation to another does not automatically make the lender liable for the acts and omissions of the borrower." *Krivo,* 483 F.2d at 1104, *citing Peterson v. Chicago, Rock Island and Pacific Company,* 205 U.S. 364, 27 S.Ct. 513, 51 L.Ed. 841 (1907). Joslyn also asserts that the James Company hired and fired Lincoln's executive officers. This allegation is based upon the hiring of Lacy and the resignation of Hayes. Though this is minimally indicative of control, it can hardly be said to rise to the level justifying disregard of the corporate form. Indeed, "to justify a judicial derogation of the separateness of a corporate creature, an aggrieved party must prove something more than ... the parent's use of its power as an incident of its stock ownership to elect officers and directors of the subsidiary." *Berger,* 453 F.2d at 994.

Joslyn also takes issue with the fact that T.L. James Sr., G.W. James and V.A. Davidson worked out of James Company's corporate offices. Lincoln neither had a lease nor paid rent for the use of these offices. Once again, this is only marginally relevant. These individuals were officers of both corporations. Clearly, they had to work somewhere. That they chose to work out of James Company's corporate offices simply is not sufficient to disregard the separate corporate structures.

The lengthy factual account set forth above establishes beyond doubt that Lin-coln strictly adhered to basic corporate formalities by keeping its own books and records and frequently and periodically holding shareholder and director meetings. The daily operations of Lincoln and James Company were kept separate. The driving forces behind Lincoln were Messrs. Hayes and Tooke, neither of whom was employed by James Company. Lincoln owned its own property where the physical plant was situated. This property was not utilized for the business of James Company. None of Lincoln's employees were on the payroll of James Company. Though James Company provided capital for Lincoln's initial incorporation, it was the effort and initiative of Messrs. Tooke and Hayes that resulted in the formation of Lincoln. Lincoln filed separate income tax returns.

In addition to these compelling facts, it should also be noted that Lincoln paid its own bills and made arrangements for employee benefits such as sick pay, retirement and profit sharing. Lincoln Creosoting's invoices directed that payment be made to Lincoln and not to James Company.

## SUMMARY JUDGMENT STANDARDS

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses in the spirit of the rule requiring a just, speedy and inexpensive determination of every action. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986); *Meyers v. M/V Eugenio C,* 842 F.2d 815, 816–17 (5th Cir.1988). Indeed, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole...." *Celotex,* 106 S.Ct. at 2555, *citing* Fed.R.Civ.P. 1 and Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465 (1984).

A party seeking summary judgment always bears the initial burden of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex*, 106 S.Ct. at 2553. A defendant moving for summary judgment may rest on the absence of evidence to support an essential element of the plaintiff's case. *Celotex*, 106 S.Ct. at 2554; *International Association of Machinists and Aerospace Workers, AFL–CIO, Lodge No. 2504 v. Intercontinental Manufacturing Company, Inc.*, 812 F.2d 219, 222 (5th Cir.1987). Once this burden has been established, the burden shifts to the nonmoving party to demonstrate a genuine issue of material fact. *Matsushita Electric Industrial Company v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). If the evidence is merely colorable or not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In fact, the nonmoving party has an affirmative duty to come forth with "significant probative evidence demonstrating the existence of a triable issue of fact." *Southmark Properties v. Charles House Corp.*, 742 F.2d 862, 877 (5th Cir.1984).

The summary judgment standard has been said to mirror that of Fed.R.Civ.P. 41(b) for involuntary dismissal in nonjury cases. *Professional Managers v. Fawer, Brian, Hardy & Zatzkis*, 799 F.2d 218, 223 (5th Cir.1986). In this respect, Judge Rubin has noted:

> If the decision is to be reached by the court, and there are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though decision may depend on inferences to be drawn from what has been incontrovertibly proved ... even if that conclusion is deemed 'factual' or involves a 'mixed question of law and fact.' A trial on the merits would reveal no additional data. Hearing and viewing the witnesses subject to cross-examination would not aid the determination if there

are neither issues of credibility nor controversies with respect to the substance of the proposed testimony. The judge, as trier of fact, is in a position to and ought to draw his inferences without resort to the expenses of trial.

*Nunez v. Superior Oil Company*, 572 F.2d 1119, 1123–24 (5th Cir.1978).

The court is satisfied that James Company fulfilled its initial burden by first proving that liability will attach only if the corporate veil is pierced and then by establishing, through competent proof, facts showing that under the governing substantive law the corporate form should not be disregarded. Joslyn's rebutting facts and arguments, even considered in their totality, simply do not constitute significant probative evidence demonstrating a triable issue of fact. This is especially true in this nonjury case where substantial discovery has been conducted. This court was particularly liberal in affording the parties ample opportunity to brief the legal issues and provide supporting documentation. Joslyn has not made the court aware of any uncompleted discovery which would be relevant toward the issue of derivative liability. Stated differently, Joslyn has not come forward with proof demonstrating a triable issue of fact as to whether the James Company exercised total domination over Lincoln to the extent that Lincoln manifested no separate corporate interest of its own and functioned solely to achieve the purposes of James Company. *Jon–T Chemicals*, 768 F.2d at 691; *Krivo*, 483 F.2d at 1106. There is simply no proof that James Company had complete domination of finances, policies and practices to cause Lincoln to be not a separate business entity but a mere conduit of James Company. *Id.*

Based on the foregoing, the court concludes that summary judgment be GRANTED in favor of T.L. James & Company, and that all claims against it be DISMISSED WITH PREJUDICE.[20] Assuming, without

---

[20] Though this court declined to follow the analysis utilized by the cases cited in footnote 4, *supra*, it is noteworthy that this court would have likely reached the same result under applicable corporate law at least in *Conservation Chemical, Mottolo* and *Shore Realty*. These cases involved factual situations where the personal participation in the illegal disposal of hazardous waste by the corporate officers was significant. As one commentator has noted, these

deciding, that the LEQA is constitutional and Joslyn has satisfied prerequisites to filing an action, the foregoing analysis establishes that Joslyn cannot pierce the corporate veil under Louisiana law, which utilizes a similar if not more stringent rule than that applied in this opinion. *See, generally, GRW Engineers, Inc. v. Elam,* 504 So.2d 117, 120 (La.App. 2d Cir.1987), *writ denied,* 506 So.2d 1230 (La.1987); *Harris v. Best of America, Inc.,* 466 So.2d 1309, 1315 (La.App. 1st Cir.1985), *writ denied,* 470 So.2d 121 (La.1985); *Kingsman Enterprises, Inc. v. Bakersfield Electric Company, Inc.,* 339 So.2d 1280, 1282 (La.App. 1st Cir. 1976); *Menard v. Associated Royal Crown Bottling Company,* 249 So.2d 363, 364–65 (La.App. 4th Cir.1971). Accordingly, summary judgment must be GRANTED in favor of T.L. James & Company with respect to claims against it under LEQA.

An order consistent with the terms of this memorandum ruling shall issue herewith.

---

"courts have avoided the common law rule of limited liability by either explicitly or implicitly applying a generally recognized exception; a corporate officer is liable for the wrongful acts of a corporation when he personally participates in the wrongful conduct." Comment, 38 Mercer L.Rev. at 685. If T.L. James & Company and its officers and directors had been actively involved in the day-to-day operations of Lincoln, including the disposal of hazardous waste, then, arguably, liability would attach. *See, generally, Shingleton v. Armor Velvet Corp.,* 621 F.2d 180 (5th Cir.1980); *L.C.L. Theatres, Inc. v. Columbia Pictures Industries, Inc.,* 619 F.2d 455 (5th Cir.1980); *Tillman v. Wheaton–Haven Recreation Associations, Inc.,* 517 F.2d 1141 (5th Cir.1975).