**PEL–STAR ENERGY, INC.
and John H. Harvison**

v.

**UNITED STATES DEPARTMENT
OF ENERGY et al.**

Civ. A. No. 93–2145.

United States District Court,
W.D. Louisiana,
Shreveport Division.

June 12, 1995.

---

L. Edwin Greet, Peatross, Greer & Frazier, Shreveport, LA and William H. Bode, William H. Bode & Assoc., Washington, DC, for plaintiff.

Michael D. Skinner, U.S. Atty., Lafayette, LA and John L. Gurney, U.S. Dept. of Energy, Washington, DC, for defendants.

## MEMORANDUM RULING

STAGG, District Judge.

The complaint in this case seeks judicial review of a Remedial Order issued by the Federal Energy Regulatory Commission ("FERC") on October 19, 1993. The plaintiffs, Pel–Star Energy, Inc. ("Pel–Star") and John H. Harvison filed a motion improperly styled as one for summary judgment. That motion was denied in a Memorandum Ruling issued on February 13, 1995. Plaintiffs thereafter filed a Motion to Reconsider which was denied in the Memorandum Ruling of March 14, 1995. Michael Harvison and Kay Harvison Parker, the children of John H. Harvison and shareholders in Pel–Star, subsequently requested leave to file an *amicus*

*curiae* brief. The court granted the request and vacated its March 14, 1995 ruling. After considering, again, the record (some 6,500 pages in eleven volumes) and the extensive briefs, the decision of February 13, 1995 began to appear wrongly decided. To aid in resolving doubts being engendered, the parties were requested to present oral argument on the questionable points which were troubling this court.

After further research and study, the court now issues the following opinion upon reconsideration of this matter. The original ruling denying summary judgment, issued by the court in this case on February 13, 1995, is hereby withdrawn.

### FACTS

Pel–Star was incorporated in Texas in 1978 by James E. Stevens and John H. Harvison for the purpose of engaging in the purchase and sale of crude oil. During the time period covering the acts at issue in this case, Stevens and Harvison constituted the Board of Directors of Pel–Star. Stevens served as president of the corporation and owned fifty per cent of the stock, while Harvison acted as vice president and owned ten per cent of the stock. The remaining forty per cent of the stock was divided between Harvison's two children, Michael and Kay Lynn. Pel–Star was subsequently re-incorporated in Louisiana on December 16, 1988.

Upon its incorporation, Pel–Star was capitalized with $2,000, the minimum capital requirement for Texas corporations. Twenty thousand shares of capital stock were issued. Stevens and Harvison then executed guaranty agreements in which each pledged personal assets to the corporation as security for the corporation's purchases of crude oil. In exchange for these personal guaranties, Stevens and Harvison received .02 cents and .04 cents, respectively, per barrel of oil sold as consideration for these pledges.

On June 13, 1993, following an audit of Pel–Star's books, the Economic Regulatory Administration ("ERA") of the Department of Energy ("DOE") issued a proposed Remedial Order to Pel–Star for violation of Federal "Anti–Layering" Regulations, found at 10 C.F.R. § 212.186 (1981). The Anti–Layering Regulations were promulgated by DOE and became effective January 1, 1978. As the name indicates, these regulations were enacted to discourage a practice among crude oil resellers known as "layering." [1]

In the proposed Remedial Order issued to Pel–Star, ERA documented two hundred and

1. The following is a brief synopsis of the development of "layering." The Economic Stabilization Act was enacted in 1970 and was followed by the Emergency Petroleum Allocation Act of 1973 ("EPAA"). The EPAA established a three-tier pricing system for first sales of crude oil.

Under these provisions, there were two levels of price controlled oil (lower tier, or old oil, and upper tier or new oil), as well as free market priced oil. Production up to a level set during a base period was sold as old oil, the excess could be sold at a higher controlled price as "new" oil, while the third tier consisted of foreign crude oil and, after September 1, 1976, stripper oil, both of which could be sold at free market prices. *United States v. Sutton,* 795 F.2d 1040, 1051 (Temp.Emer.Ct.App.1986), *cert. denied* 479 U.S. 1030, 107 S.Ct. 873, 93 L.Ed.2d 828 (1987). This pricing system created an advantage for refiners with access to low cost price controlled crude oil. In order to address this inequity, the Federal Energy Office adopted the "Entitlements Program" in 1974. Under this program, a refiner was required to have one "entitlement" for each barrel of lower-tier oil it refined. Every month each refiner re-

ceived a number of entitlements based on its proportionate share of the national supply of lower-tier oil. If a refiner received fewer entitlements than the number of barrels of lower-tier oil actually refined in that month, the refiner was required to purchase entitlements from other refiners who had less than average access to lower-tier oil. If the entitlements received by a refiner exceeded the number of barrels of lower-tier oil actually refined during that month, the refiner was required to sell the excess entitlements.

Beginning in 1977, DOE became aware that the number of crude-oil resellers was increasing rapidly, and that the new refiners were not performing the historical functions of crude-oil resellers, namely, gathering small quantities of crude oil and transporting it to a refinery. *MAPCO Int'l, Inc. v. Fed. Energy Regulatory Comm'n,* 993 F.2d 235, 238 (Temp.Emer.Ct.App.1993). Under the price controls in place from 1978 to 1981, crude oil resellers were unable to make a profit on oil sold by them unless they performed a function historically associated with the crude oil industry. The process of marking up the oil by the reseller became known as "layering."

twenty-eight separate transactions in which Pel–Star allegedly violated the layering regulations. The record contains two examples of such illegitimate transactions which the court reiterates here by way of illustration.

In June 1978, Pel–Star purchased 30,000 barrels of light Louisiana crude oil from BPM Ltd. via in-line transfer. The purchase price was $14.05 per barrel. At the time of purchase, the oil was located in the Shell Capline pipeline in St. James, Louisiana. While the oil was in the same location, it was resold by Pel–Star, via in-line transfer, to P & O Falco, Inc. at a price of $14.55 per barrel. Similarly, in February 1980, Pel–Star purchased, via in-line transfer, 40,600 barrels of crude oil from RFB Petroleum for $17.25 per barrel and immediately resold the same oil to Bay Port Refining Company for $25.61 per barrel. These two transactions were allegedly made by Pel–Star without having performed any service whatsoever with respect to the oil. The DOE audit revealed that Pel–Star had received $9,327,-705.78 in overcharges for these two hundred and twenty-eight transactions.[2]

On December 23, 1983, ERA filed a motion to join Pel–Star's four shareholders as parties to the proceedings under the Remedial Order. The Office of Hearing and Appeals ("OHA") agreed in part, noting that a *prima facie* case of liability had been established against Stevens and Harvison. OHA declined, however, to join Harvison's two children to the proceedings. Stevens and Harvison were then given the opportunity to object to the proposed Remedial Order and to introduce evidence in support of their position that they should not be individually liable for any actions taken by Pel–Star. In the Remedial Order issued August 29, 1983, DOE noted that Stevens and Harvison had failed to file a Statement of Objections. R 000209. DOE then noted that "they [Stevens and Harvison] thus failed to meet their burden of going forward with the evidence. On the basis of the record upon which the April 4, 1984 Interlocutory Decision was based, which

we discuss below, we therefore find that Stevens and Harvison should be held personally liable for Pel–Star's regulatory violations." *Id.*

Subsequently, on March 27, 1987, OHA issued a Remedial Order, in which it reached the following conclusions:

1. The proposed Remedial Order established a *prima facie* case of a regulatory violation;

2. The promulgation of the layering regulations did not violate the procedural requirements of the Administrative Procedure Act;

3. The layering regulations are substantively valid;

4. Pel–Star provided no historical and traditional reseller services in conjunction with the allegedly illegitimate transaction;

5. Both Stevens and Harvison were individually liable for the debts of Pel–Star under the alter-ego theory; and

6. Stevens was individually liable for the debts of Pel–Star under the "central figure" theory.

This ruling also ordered Pel–Star, Stevens and Harvison to refund the overcharges with interest. *Pel–Star Energy, Inc.,* 15 DOE (CCH) ¶ 83,028, 86,350 (1987).

In a supplemental order issued May 1, 1987, DOE noted that Stevens and Harvison did in fact submit a Statement of Objections, but the failure to consider the objections was "harmless." R. 000505. DOE then noted that it was the responsibility of Stevens and Harvison to introduce evidence sufficient to rebut the *prima facie* case established by DOE. Their failure to do so evidently transformed a *prima facie* case into probative evidence sufficient to sustain a finding of personal liability for $9,327,705.78, plus interest.

Pel–Star, Stevens and Harvison then appealed this decision to FERC, where the case

---

**2.** An affidavit executed by James C. Stevens was submitted to the court in connection with the *amicus curiae* brief recently filed by the Harvison children. In his affidavit, Stevens strongly disputes the correctness of the two examples cited.

Specifically, he notes that the oil which Pel–Star sold in the second half of each of the two transactions was not the same oil it purchased. Accordingly, Stevens maintains that no "layering" occurred.

was assigned to Administrative Law Judge Thomas I. Megan ("the ALJ"). In the course of this administrative appeal, Stevens settled with DOE for approximately $30,000 and was deleted as a party. R. 003591. The ALJ then issued a ruling affirming the Remedial Order. *Pel–Star Energy, Inc.,* 52 FERC (CCH) ¶ 63,006 (1990). The ALJ did, however, modify the Remedial Order in light of Stevens' settlement with DOE, concluding that Harvison's liability should be reduced to fifty per cent of the overcharges, or $4,663,-852.89. This proposed decision was affirmed and adopted by FERC on October 19, 1993. *Pel–Star Energy, Inc.,* 65 FERC (CCH) ¶ 61,079 (1993).

## *ANALYSIS:*

### I. STANDARD OF REVIEW

■ The standard of review to be exercised by this court is an issue about which the parties cannot agree. This dispute is understandable given the voluminous and conflicting law in the area of judicial review of administrative decisions.[3] Section 211(d)(1) of the Economic Stabilization Act of 1970 provides:

> [N]o order of [DOE] shall be enjoined or set aside, in whole or in part, unless a final judgment determines that such order is in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence.

12 U.S.C. § 1904; *Research Fuels, Inc. v. U.S. Dep't of Energy,* 977 F.2d 601, 606 (Temp.Emer.Ct.App.1992). This "substantial evidence" test is applied to review of agency orders. *Mobil Oil Corp. v. U.S. Dep't of Energy,* 728 F.2d 1477, 1486 n. 12 (Temp.Emer.Ct.App.1983). In reviewing informal rulemaking engaged in by an agency, however, the court will not set aside the factual findings of FERC unless the decision was "arbitrary, capricious or otherwise not in accordance with law." *Mesa Operating Ltd. Partnership v. U.S. Dep't of Interior,* 931 F.2d 318, 322 (5th Cir.1991), *cert. denied,* 502

U.S. 1058, 112 S.Ct. 934, 117 L.Ed.2d 106 (1992); 5 U.S.C. § 706(2)(A). Under the "substantial evidence" test, the court must afford deference to the agency's decision. *MAPCO Int'l v. Fed. Energy Regulatory Comm'n,* 993 F.2d 235, 239 (Temp.Emer.Ct.App.1993). "[T]his court must approve the DOE decision if there is a rational basis for it." *Id.* This deferential standard of review is based on the recognition that an agency possesses special expertise and knowledge on matters involving its domain. *MAPCO,* 993 F.2d at 239.

■ There is another line of jurisprudence which recognizes that this court does not owe deference to FERC in matters of law. *Fed. Trade Comm'n v. Ind. Fed'n of Dentists,* 476 U.S. 447, 454, 106 S.Ct. 2009, 2016, 90 L.Ed.2d 445 (1986); *Faour v. U.S. Dep't of Agric.,* 985 F.2d 217, 219 (5th Cir. 1993). DOE agrees that this court should conduct a *de novo* review of FERC's enunciation of the applicable legal standard for piercing the corporate veil. DOE maintains, however, that the application of the legal precepts to the facts of the case are reviewed under the substantial evidence test. As noted by the *Federal Trade Commission* court, "[t]he legal issues presented—that is, the identification of governing legal standards **and their application to the facts found—** are, by contrast, for the courts to resolve." *Fed. Trade Comm'n,* 476 U.S. at 454, 106 S.Ct. at 2016 (emphasis added); but see *McCall Stock Farms, Inc. v. U.S.,* 14 F.3d 1562, 1567 (Fed.Cir.1993) (issue before court was whether agency's application of alter ego doctrine was arbitrary, capricious, or abuse of discretion). Moreover, the doctrinal basis for piercing the corporate veil does not lie within the administrative expertise of the Federal Regulatory Energy Commission. In this case, a court is better equipped to handle such legal analysis.

---

**3.** An administrative law treatise notes that of the forty thousand pages of opinions produced by federal appellate courts each year, more than five hundred of these pages "are devoted to detailed statements about scope of review of administrative action; most of that verbiage is harmless, for neither the judges nor the readers of opinions

## II. ISSUES PRESENTED FOR RE- VIEW[4]

Plaintiffs present the following issues on appeal: (1) FERC's attempt to impose personal liability on Harvison is beyond its authority because FERC is not an Article III court; (2) FERC applied an incorrect legal standard in piercing the corporate veil and in imposing personal liability on Harvison; (3) there is insufficient evidence to support disregarding Pel–Star's corporate form in this case; and (4) FERC erred in imposing liability for "restitution" on Harvison without a determination that he received any benefit from the alleged violations. The court will address each argument in turn.

## A. DOES FERC HAVE THE AU- THORITY TO IMPOSE PERSONAL LIA- BILITY ON HARVISON?

Before the court addresses Harvison's substantive arguments, it must make a preliminary determination with respect to FERC's authority in this matter. Petitioner argues that FERC's attempt to impose personal liability on Harvison is beyond its authority because, as a non-Article III body without jury factfinding, FERC lacks either the statutory or constitutional power to adjudicate such a common law theory of liability.

■ Before addressing the merits of Harvison's argument, the ALJ noted that any jurisdictional challenges were waived by Harvison.[5] Harvison failed to raise this issue in his appeal of OHA's Remedial Order. Rule 906(b)(2)(ii) of the Commission's Rules of Practice and Procedure provides that if new facts or issues are raised on appeal of the OHA's order, permission may be sought if the facts or issues meet the criteria set forth in Rule 907(a). Rule 907(a) provides that facts or issues not raised before the OHA must have been unknown and incapable of discovery with the exercise of due care when

the case was before OHA, or the facts or issues are of such a nature that the plaintiff was not permitted to raise them in the prior proceeding because of adverse procedural rulings, and they are necessary to properly adjudicate the case.[6]

■ As noted by the ALJ, Harvison has not complied with the applicable provisions and is procedurally barred from attacking the jurisdiction of FERC. Moreover, according to the ALJ, Harvison actively sought to pursue his appeal of this matter before FERC.[7] Such actions constitute a waiver of jurisdictional objections. *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 849, 106 S.Ct. 3245, 3256, 92 L.Ed.2d 675 (1986). Because the ALJ addressed the jurisdictional issue despite the waiver, however, this court will review Harvison's argument.

■ Both the ALJ and FERC rejected Harvison's argument, finding that the EPAA authorizes DOE to seek restitution for overcharges through administrative proceedings.[8] Harvison argues, however, that FERC is not an Article III court and accordingly can not exercise those rights granted exclusively to Article III courts. Specifically, Harvison argues that he is entitled to a jury trial. Thus, this court's inquiry must be whether Harvison is entitled to a jury trial in this matter.

■ The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved...." "Suits at common law" are defined as "suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were regarded, and equitable remedies were administered." *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 447, 7 L.Ed. 732 (1830). Con-

---

take it seriously." 5 KENNETH CULP DAVIS, *Administrative Law Treatise* § 29:2 (1984).

4. Plaintiffs have styled this motion as one seeking summary judgment. However, in this case, this court does not sit as a district court, but rather as an appellate court. Accordingly, summary judgment is not the proper tool for resolution of this dispute. Both parties have briefed all of the issues raised on the appeal, and this court will conduct a review of the

agency decision as opposed to an inquiry into the propriety of granting summary judgment.

5. 52 FERC (CCH) ¶ 63,006 at 65,014.

6. *Id.*

7. *Id.*

8. 52 FERC (CCH) ¶ 63,006 at 65,015; 65 FERC (CCH) 61,079 at 61,502.

gress is authorized to create statutory rights and assign their resolution to administrative bodies rather than Article III courts. *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 51, 109 S.Ct. 2782, 2795, 106 L.Ed.2d 26 (1989).

> Congress may devise novel causes of action involving public rights free from the strictures of the Seventh Amendment if it assigns their adjudication to tribunals without statutory authority to employ juries as factfinders. But it lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury.

*Granfinanciera,* 492 U.S. at 51–52, 109 S.Ct. at 2795. There is a two-part test to be applied in determining whether a jury trial is required. First, the court must compare the statutory action to 18th century actions brought in English courts prior to the merger of the courts of law and equity. *Austin v. Shalala,* 994 F.2d 1170, 1176 (5th Cir.1993), *citing Granfinanciera,* 492 U.S. at 42, 109 S.Ct. at 2790. Secondly, the court must examine the remedy sought and determine whether it is legal or equitable in nature. *Id.* The second prong of the test is more important than the first prong. *Id.* If an application of this test indicates that a party is entitled to a jury trial, the court must then determine whether Congress may assign and has assigned resolution of the claim to a non-Article III adjudicative body. *Id.*

▪ Applying the first prong of the *Granfinanciera* test, DOE is seeking restitution from Mr. Harvison.[9] This is a suit sounding in quasi-contract. *Austin,* 994 F.2d at 1176, *citing* E. ALLAN FARNSWORTH, CONTRACTS 98 (1982). "A suit in quasi-contract falls under the common law writ of general assumpsit." *Id.* In England in 1791, this was an action at law and was tried to a jury. *Id., citing Granfinanciera,* 492 U.S. at 48, 109 S.Ct. at 2793. Thus, the first prong of the *Granfinanciera* test weighs in

favor of the necessity of a jury. The second prong of the test similarly requires that a jury be provided. The United States seeks monetary damages due to the layering violations committed by Pel–Star. Recovery of money damages is a legal remedy as opposed to an equitable one. *Austin,* 994 F.2d at 1177; *Beard v. Braunstein,* 914 F.2d 434, 438 (3d Cir.1990).

▪ The court must now determine whether Congress has delegated the authority to adjudicate the government's restitution claim to an administrative agency, namely FERC. Congress may only deny trial by jury in actions at law where "public rights" are involved. *Austin,* 994 F.2d at 1177. The Supreme Court has defined cases involving "public rights" as those "where the Government is involved in its sovereign capacity under an otherwise valid statute creating enforceable public rights. Wholly private tort, contract, and property cases, as well as a vast range of other cases as well are not at all implicated." *Atlas Roofing Co. v. Occupational Safety and Health Review Comm'n,* 430 U.S. 442, 458, 97 S.Ct. 1261, 1270, 51 L.Ed.2d 464 (1977).

> [I]f a statutory cause of action is legal in nature, the question whether the Seventh Amendment permits Congress to assign its adjudication to a tribunal that does not employ juries as factfinders requires the same answer as the question whether Article III allows Congress to assign adjudication of that cause of action to a non-Article III tribunal.... Conversely, if Congress may assign the adjudication of a statutory cause of action to a non-Article III tribunal, then the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder.

*Granfinanciera,* 492 U.S. at 54, 109 S.Ct. at 2796. The Court has rejected the argument

---

**9.** DOE argues that this action should be classified as an action brought to pierce the veil. See DOE brief at 12. DOE cites *Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R. Co.,* 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974) for the proposition that an action to disregard corporate form is one sounding in equity. *Bangor Punta,* 417 U.S. at 713, 94 S.Ct. at 2584 (when corporate form used to defeat "overriding

public policy," courts of equity will disregard the form.) While an action to pierce the corporate veil may sound in equity, the court concludes that this is not an action to pierce the corporate veil. DOE seeks restitution from Pel–Star and Harvison as the alter-ego of Pel–Star. While veil piercing is an important issue in the case, the action is one for restitution.

that, for Congress to commit adjudication of a statutory cause of action to a non-Article III body, the action must arise between the government and others. *Granfinanciera,* 492 U.S. at 54, 109 S.Ct. at 2797, *citing N. Pipeline Constr. Co. v. Marathon Pipe Line Company,* 458 U.S. 50, 69, 102 S.Ct. 2858, 2870, 73 L.Ed.2d 598 (1982).

The ALJ cited *Bonray Oil Co. v. U.S. Dep't of Energy,* 472 F.Supp. 899 (W.D.Okla. 1978), *aff'd,* 601 F.2d 1191 (Temp.Emer.Ct.App.1979) in support of his conclusion. In *Bonray,* the district court concluded that the power to order restitution of overcharges is an implied power granted to DOE by the broad purposes and goals of the EPAA. Similarly, in *Sauder v. U.S. Dep't of Energy,* 648 F.2d 1341, 1348–49 (Temp.Emer.Ct.App.1981), the court stated that "we now hold that it is within the agency's authority to order an owner-operator in a situation such as Sauder's to make restitution of the total overcharge...." *Sauder,* 648 F.2d at 1349.

The court finds that this action involves the adjudication of "public rights." In addition to relying on precedent to resolve this issue, the court's independent examination of the facts mandates the same conclusion. This is an action by the United States against a corporation pursuant to statute. As noted by the ALJ in this case, "[i]t is the public's right for which vindication is sought when the Department of Energy, in performance of the executive department's constitutional function to enforce the laws, seeks restitution for charges in excess of those levels set by law. Enforcement of a federal regulatory scheme is a public rights matter." [10] FERC has imposed personal liability on Harvison under a theory that he was, in reality, the corporation.

**B. DID FERC APPLY THE INCORRECT STANDARD IN PIERCING THE CORPORATE VEIL?**

■ Harvison argues that FERC erred in applying a federal common law standard of alter-ego theory rather than the applicable standard under state law. Harvison argues that, because corporations are creatures of state law, their form should be determined in accordance with that law. Harvison argues that the United States Court of Appeals for the Fifth Circuit, as well as the States of Texas and Louisiana, would apply the same analysis to determine whether to pierce the corporate veil and impose personal liability on a shareholder.[11] According to Harvison, FERC applied a different, relaxed standard for personal liability in this case that was derived from one of its earlier decisions.

**1. Which law to apply?**

■ The first issue to be addressed by this court is whether to apply federal common law or state law to the issue of "veil piercing." While this court recognizes that "there is no federal general common law," *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938), it is beyond dispute that there are legal issues governed by "federal law." *U.S. v. Kimbell Foods, Inc.,* 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979); *Clearfield Trust Co. v. U.S.,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). The Court in *Clearfield Trust* explained the nature of claims necessitating the application of federal law:

> When the United States disburses its funds or pays its debts, it is exercising a constitutional function or power.... The authority to issue the check had its origin in the Constitution and the statutes of the United States and was in no way dependent on the laws [of any State]. The duties imposed upon the United States and the rights acquired by it ... find their roots in the same federal sources. In absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards. (Citations omitted).

318 U.S. at 366–67, 63 S.Ct. at 575 (citations omitted). In *Kimbell Foods,* the United

---

**10.** 52 FERC (CCH) ¶ 63,006 at 65,015.

**11.** Harvison correctly notes that this court should look to the law of its regional circuit court in resolving this issue, despite the Federal Circuit's jurisdiction of an appeal from this ruling. *Consumers Power Co. v. U.S. Dep't of Energy,* 894 F.2d 1571, 1579 (Temp.Emer.Ct.App.1990).

States Supreme Court determined that the priority of liens stemming from federal lending programs must be determined through application of federal law. *Kimbell Foods,* 440 U.S. at 726, 99 S.Ct. at 1457. The Court noted that the federal agencies at issue derived their authority from specific Acts of Congress passed in the exercise of a "constitutional function or power." *Kimbell Foods,* 440 U.S. at 726, 99 S.Ct. at 1457. "When Government activities 'aris[e] from and bea[r] heavily upon a federal ... program,' the Constitution and Acts of Congress 'require otherwise than that state law govern of its own force.' In such contexts, federal interests are sufficiently implicated to warrant the protection of federal law." *Kimbell Foods,* 440 U.S. at 727, 99 S.Ct. at 1457. In this case, a federal administrative agency is pursuing restitution under authority granted to it by a comprehensive federal regulatory scheme. Under these facts, the court concludes that the decision in this case is governed by federal law.

**2. What is federal law in this context?**

Having decided that federal law is applicable to this case, the court must now define that federal law. Defendants argue that this is a non-issue because state and federal common law standards governing alter-ego liability are essentially identical. In *Joslyn Corp. v. T.L. James & Co., Inc.,* 696 F.Supp. 222, 226 (W.D.La.1988), *aff'd,* 893 F.2d 80 (5th Cir.1990), *cert. denied,* 498 U.S. 1108, 111 S.Ct. 1017, 112 L.Ed.2d 1098 (1991), this court reached the same conclusion. *Joslyn,* 696 F.Supp. at 226; *see also U.S. v. Jon–T Chems., Inc.,* 768 F.2d 686, 690 n. 6 (5th Cir.1985), *cert. denied* 475 U.S. 1014, 106 S.Ct. 1194, 89 L.Ed.2d 309 (1986). However, these opinions addressed the alter ego issue in the context of disregarding the corporate

form of a subsidiary and piercing the veil in order to hold the parent corporation liable.[12] Accordingly, the standard for holding an individual liable for corporate debts was not mentioned, and this court will not rely on such authority.

There is, however, a federal district court case equating Louisiana law with "federal common law" on the alter ego issue in the individual liability context. *Riverside Maritime Enters., Inc. v. Ishmael,* 1991 WL 68214, *3 (E.D.La.1991). In *Riverside,* the court concluded that "[u]nder Louisiana law and federal common law, a finding of control or domination by an individual and the use of the corporate fiction are prerequisites to the alter ego theory of liability." *Riverside,* 1991 WL 68214 at *3. The court went on to find that "[t]he corporate entity will be disregarded when it is necessary to promote justice or avoid inequitable results." *Id.,* citing *Giuffria Realty Co. v. Kathman–Landry, Inc.,* 173 So.2d 329, 334 (La.App. 4th Cir.1965).

By comparison, "[t]here is no litmus test in the federal courts governing when to disregard corporate form." *Thomas v. Peacock,* 39 F.3d 493 (4th Cir.1994). It is clear, however, that the corporate entity will not be recognized "when to do so would work fraud or injustice." *Taylor v. Standard Gas & Electric Co.,* 306 U.S. 307, 322, 59 S.Ct. 543, 550, 83 L.Ed. 669 (1939). "The general rule adopted in the federal cases is that 'a corporate entity may be disregarded in the interests of public convenience, fairness and equity.'" *Thomas,* 39 F.3d 493, quoting *Alman v. Danin,* 801 F.2d 1, 4 (1st Cir.1986). The alter ego doctrine permits veil piercing "where the stockholder and corporation have not maintained separate identities and 'adherence to the corporate fiction [would] sanction a fraud, promote injustice, or lead to

---

**12.** At the oral arguments in this matter, counsel for the Department of Energy argued that the alter ego "test" found in *Joslyn* was applicable to this case. The twelve factors listed in *Joslyn* included common stock ownership between the parent and subsidiary corporation, common directors and officers, common business departments, consolidated financial statements of parent and subsidiary, financing of subsidiary by parent, and payment of salaries and expenses of subsidiary by parent. *Joslyn,* 696 F.Supp. at 227. In arguing that these factors were met in

the instant case, Mr. Crockett seemed to suggest that Harvison and Stevens were a partnership separate from the corporation Pel–Star. For example, the "partnership" owned stock in Pel–Star, thus apparently satisfying one of the factors listed by this court in *Joslyn.* When questioned about this by the court, Mr. Crockett responded that Stevens and Harvison acted as a partnership rather than a corporation. The assumption of a second entity bootstraps this factual situation into apparent harmony with *Joslyn.* The court rejects such reasoning.

evasion of legal obligations.' " *Fed. Deposit Ins. Corp. v. Oldenburg*, 34 F.3d 1529, 1555 (10th Cir.1994), citing *Nat'l Labor Relations Bd. v. Greater Ks. City Roofing*, 2 F.3d 1047, 1052 (10th Cir.1993).

In the proposed Remedial Order issued by OHA, the panel stated that,

> the corporate entity may be disregarded and the controlling shareholders may be held responsible for corporate obligations where there is such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, and where failure to pierce the corporate veil would lead to an inequitable result.

15 DOE (CCH) ¶ 83,028 at 86,348. The panel also noted that undercapitalization of a corporation in light of its intended purpose was a significant factor. *Id.* Other factors considered were "failure to observe corporate formalities, non-payment of dividends, non-participation of other shareholders in the corporation's operation and decisions, and whether the corporation is merely a facade for the operations of the dominant shareholder or shareholders." *Id.* at 86,348–49. In light of this test, the panel concluded that Pel–Star was the alter ego of Stevens and Harvison. The panel further noted that Pel–Star was capitalized with only $2,000, an amount grossly inadequate in comparison to the multi-million dollar operations of the company. *Id.* at 86,349. There were no dividend payments to any shareholders, nor had there been any cash disbursements to Kay Lynn or Michael Harvison, the other two shareholders of Pel–Star. *Id.* The panel also stated that Stevens and Harvison received substantial payments in the form of guaranty fees, salaries, and bonuses. *Id.*[13] The panel went on to find that failure to pierce the veil in this case would lead to an inequitable result. *Id.* at 86,350.

The ALJ affirmed the proposed Remedial Order. In so doing, he relied on the alter ego test enunciated in *William Valentine and Sons, Inc.*, 1989 WL 260666, 46 F.E.R.C.

¶ 61,252 (F.E.R.C.1989). Under *Valentine*, a court analyzing an alter ego question must engage in a two-pronged inquiry:

> (1) is there such unity of interest and ownership that the separate personalities of the corporation and the controlling individual no longer exist? and (2) will adherence to the corporate fiction or the failure to disregard the corporate form result in fraud or injustice, i.e. if the acts are treated as those of the corporation alone, will an inequitable result follow?

*Valentine*, 1989 WL 260666 at \*9, *citing Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142, 1152 (5th Cir.1987); *McKinney v. Gannett Co.*, 817 F.2d 659, 666 (10th Cir.1987); *Labadie Coal Co. v. Black*, 672 F.2d 92, 96 (D.C.Cir.1982); *U.S. v. Standard Beauty Supply Stores, Inc.*, 561 F.2d 774, 777 (9th Cir.1977). The court in *Valentine* also listed factors to consider in determining whether there is a unity of interest between corporation and shareholder:

> the failure to maintain corporate formalities; under-capitalization; non-payment of dividends; commingling of funds and other assets of the corporation; diversion of corporate funds/assets to non-corporate, personal uses; and use of the same office by the corporation and its shareholders....

*Id.* The ALJ reiterated the relevant facts and affirmed the decision to pierce the veil. Similarly, FERC affirmed the decision to pierce the veil and hold Harvison individually liable. FERC cited the *Valentine* test but did not analyze the issue as thoroughly as the ALJ.

▮ Harvison argues that *Valentine* is a discredited standard. Specifically, he argues that while *Valentine* acknowledged the traditional common law standard for piercing the veil, it went on to reduce the burden required to meet that test:

> To carry out the policies of the EPAA, federal law reduces the stringency of the two-pronged piercing the corporate veil

---

**13.** In its opinion, the OHA stated that "Stevens and Harvison received substantial payments, however, in the form of guaranty fees, salary and bonuses." 15 DOE (CCH) ¶ 83,028 at 86,349. There is no evidence, however, that John Harvi-son received anything other than guaranty fees. This is noted by OHA on the following page, but the initial statement in the opinion is misleading insofar as it suggests that Harvison received a salary or bonus.

test. With respect to the first prong, the control necessary to demonstrate unity of interest and ownership is not considered in a general sense, but with specific focus upon the objectives and subject matter of the EPAA.... The second prong of the test—the "inequitable result" prong—may be satisfied simply by proof of a violation of a federal statute, here the EPAA.

*Valentine*, 1989 WL 260666 at *13. Plaintiff argues that FERC altered the traditional piercing rule without Congressional directive.

Neither the original ruling by the OHA nor the final ruling by FERC mention this "lessened burden" aspect of the *Valentine* test. In fact, the OHA decision does not mention *Valentine* at all. The ALJ states in his opinion that the second prong of *Valentine* was satisfied through proof of violation of the EPAA.

■ This court expresses no opinion with respect to whether the above quote from *Valentine* discussing the second prong of the test is a correct statement of the law and expressly declines to rely on this aspect of the *Valentine* opinion. The court concludes, however, that the two-pronged test enunciated in *Valentine* is a correct statement of the federal law applicable in this case. *Valentine*, 1989 WL 260666 at *9.[14]

### 3. Was the FERC decision to pierce the corporate veil erroneous?

■ As stated earlier, this court need not defer to the agency on matters of legal interpretation and their application to the facts. *Fed. Trade Comm'n*, 476 U.S. at 454, 106 S.Ct. at 2016. The court concludes that the FERC decision to hold Harvison liable is contrary to well-established law and must be reversed.[15]

The FERC decision was based on the following factors: 1) Pel–Star was undercapitalized; 2) Pel–Star did not distribute dividends to its shareholders; and 3) two of the four shareholders did not participate in the management of Pel–Star.[16]

There is substantial evidence that Pel–Star was undercapitalized. The record demonstrates that the company engaged in multi-million dollar trades on a weekly, if not daily, basis. Yet the corporation was capitalized with $2,000, relying instead for its financial stability on the financial guaranties of its two active shareholders. It is also undisputed that Pel–Star did not distribute dividends to its shareholders.

There are four places in the record where the corporate governance of Pel–Star is discussed.[17] These references indicate that

---

**14.** Though the court concludes that federal law is applicable to this case, the same result obtains under state law. In Louisiana, the totality of the circumstances must be considered in determining whether to pierce the corporate veil. *Lopez v. TDI Services, Inc.*, 631 So.2d 679, 685 (La. App.3d Cir.), *writ denied*, 637 So.2d 501 (1994). "Because of the beneficial role of the corporate concept, the limited liability attendant to corporate ownership should be disregarded only in exceptional circumstances." *Id.* Some factors considered by courts in determining the propriety of "veil piercing" include, but are not limited to:

(1) comingling (sic) of corporate and shareholder funds; (2) failure to follow statutory formalities for incorporating and transacting corporate affairs; (3) under-capitalization; (4) failure to provide separate bank accounts and bookkeeping records; and (5) failure to hold regular shareholder and director meetings.

*Id., citing Riggins v. Dixie Shoring Co., Inc.*, 590 So.2d 1164, 1168 (La.1991).

**15.** In so concluding, the court again notes that FERC did use the correct legal standard in pierc-

ing the corporate veil. Its application of the law to the facts, however, is unsupportable.

**16.** In reviewing the facts of this case as determined by the agency, the court finds that FERC was correct in determining that Pel–Star was undercapitalized, did not distribute dividends, and that Harvison's two children did not participate in the daily operations of Pel–Star.

**17.** For the aid of the next persons who must wade through the thousands of pages of record, these references are offered: R. 1697–1701, 1908–1912, 1926–27, 1938–1939. It is in these pages of the cold, distant record that one must find the evidence to support the veil-piercing decision which is in question. And it is from these pages that the reader is forced to conclude whether the decision of FERC was overreaching and arbitrary. The additional evidence in the *amicus curiae* brief was quite illuminating. The initial decision by the undersigned did not properly focus sufficiently on the record on corporate governance. Subsequent scholarship of counsel provided the needed focus, and their efforts are greatly appreciated.

Pel–Star did adhere to corporate formalities. Moreover, there is absolutely no evidence in the record that Harvison participated in the "operations" of Pel–Star in any manner. The DOE opinion states that "neither Kay Lynn nor Michael Harvison have ever been involved in the management or operation of Pel–Star." 15 DOE (CCH) ¶ 83,028, at 86,-349. According to the record, however, Harvison himself did not participate in the management or operation of Pel–Star, other than to participate in board meetings.[18]

There is no evidence that Harvison controlled or dominated Pel–Star, as required in *Riverside*, 1991 WL 68214 at *3. Harvison provided a personal guaranty agreement to Pel–Star, which was the only source of any financial benefit he received from the corporation. Unlike Stevens, Harvison did not receive a salary or any bonuses from Pel–Star.[19] There is no evidence of commingling of funds, nor is there evidence that Pel–Star's profits were diverted to Harvison. During the period of the overcharges, Stevens was in charge of the company's Dallas, Texas offices. He made every trade complained of. Harvison, a resident of Fort Worth, Texas, served as the chief executive officer of a publicly traded company during this period and made no oil trades of any kind. In short, FERC has imposed substantial personal liability on an individual who was a ten percent passive shareholder who did not participate in the daily operations of the corporation.

The opinion in *Valentine* refers to whether there is "such unity of interest and ownership that the separate personalities of the corporation and the controlling individual no longer exist." *Valentine*, 1989 WL 260666 at *9. There is insufficient evidence in this case to support a finding that Harvison and Pel–Star ceased to have separate personalities. Moreover, the foregoing language refers to the "controlling individual." As demonstrated above, there is no evidence that Harvison controlled the activities of Pel–Star. To the contrary, the record discloses that Harvison provided financial backing for the corporation, while Stevens provided financial backing as well as complete management of corporate affairs.

 As noted by the *Valentine* panel, the decision to pierce the corporate veil is made cautiously and is not based on a single factor, whether undercapitalization, disregard of corporate formalities, or sole ownership. Instead, it must rest on many such factors, and the situation must present an element of injustice or fundamental unfairness.

*Valentine*, 1989 WL 260666 at *11. The only factors present in this case supporting piercing are undercapitalization, failure to pay dividends, and non-participation of two of the shareholders of the corporation.

 When questioned at oral argument about the lack of evidence in the administrative record to support piercing the veil, counsel for DOE repeatedly stated that a *prima facie* case of personal liability had been established and that Harvison failed to respond to that case. Aside from reiterating that Harvison did in fact file a Statement of Objections to the order joining him as a defendant, the court notes that under the Administrative Procedure Act, DOE bears the burden of proof in this matter. 5 U.S.C. § 556(d) ("[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof.") The Supreme Court recently addressed the meaning of "burden of proof" in the Administrative Procedure Act in *Director, Office of Workers' Compensation Programs, Dep't of Labor v. Greenwich Collieries*, —— U.S. ——, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994). The Court concluded that the "burden of proof" in an administrative action should be construed as the "burden of persuasion" as opposed to the

---

18. According to the minutes of the shareholders' meetings of Pel–Star, Harvison's children who were stockholders of Pel–Star also participated in the meetings.

19. The record indicates Harvison received a total of $382,666 in guaranty fees. R. 000804. Counsel argued that, though the guaranty agreement was in place, it was never used.

"burden of production." *Greenwich Collieries,* —— U.S. ——, 114 S.Ct. at 2257. Accordingly, DOE cannot sustain its decision simply by noting that Harvison failed to introduce evidence.[20]

The sole basis for the imposition of personal liability in this case seems to be that Pel–Star violated federal layering laws. DOE argues that it would be unfair for Harvison to escape personal liability because Pel–Star is unable to pay for the overcharges. Such reasoning completely disregards the traditional, albeit defeatable, legal protection afforded to corporate shareholders. Moreover, such logic relates to the second prong of the *Valentine* test, in which the standard is reduced due to the violation of a federal statute. The *Valentine* court noted that the second prong of the alter ego test was met simply by proving violation of a federal statute, in this case the layering regulations. This relaxed standard does not apply, however, to the first prong of the alter ego test. The first prong, that there is such a unity of interest and ownership that the corporation is not distinct from the shareholder, must still be met. It is on this basis that the court reverses the finding of FERC and its own Memorandum Ruling of February 13, 1995.[21]

## C. WAS THERE SUFFICIENT EVIDENCE TO SUPPORT A PIERCING OF THE CORPORATE VEIL?

This argument has been sufficiently addressed in the previous section.

## D. CAN FERC ORDER HARVISON TO PAY RESTITUTION WITHOUT DEMONSTRATING THAT HE ACTUALLY RECEIVED THE OVERCHARGES?

Having decided that the decision by FERC to pierce the corporate veil was erroneous, the court need not reach this issue.[22] Accordingly, the court reverses the order issued by FERC insofar as it holds John Harvison personally liable for the layering violations of Pel–Star.

**20.** The court also notes that the sole evidence which DOE relied on in determining that a *prima facie* case of personal liability had been established seems to be that Harvison received financial benefit from the corporation and that Pel–Star was undercapitalized. R. 001759. Because most, if not all, shareholders expect to receive financial benefit from their corporations, it seems that DOE relied solely on undercapitalization. This startling leap from undercapitalization to personal liability is legally insufficient to support piercing the veil.

**21.** As noted earlier, the standard of review to be applied by this court is disputed by the parties. After a review of the pertinent law, this court has concluded that it should not defer to the agency's application of piercing law to the facts. Under the "substantial evidence" standard urged by DOE, this court must affirm the agency if its decision was rational. On the record before this court, there is no rational basis for piercing the corporate veil of Pel–Star and holding Harvison personally liable.

**22.** While the court does not reach this issue, it makes note of Harvison's argument that DOE's

calculations of overcharges are unsupported by the evidence. The evidence in the administrative record consists mainly of an external audit of Pel–Star's accounts performed by DOE. There are five transactions for which the administrative record contains further support in the nature of receipts of sales and purchases. In the *amicus curiae* brief, Harvison addresses three of these five transactions in detail. He maintains that in each of the three transactions, DOE paired purchases and sales involving different oil and thus erred in its calculations.

The court also notes that plaintiffs in this case attempted to gain discovery from DOE regarding the identity of the Pel–Star auditors. Pel–Star also attempted to discover the auditors' workpapers in order to examine them and respond to the charges of layering. These discovery requests were denied because they would require the ERA to spend "appreciable time searching its files for the requested material" and "would unduly delay enforcement proceedings." R. 000515.